**D'ANDREA BROTHERS LLC, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 08–286C.**

United States Court of Federal Claims.

Nov. 18, 2010.

Jared W. Beilke, Los Angeles, CA, for plaintiff.

Sheryl Lynn Floyd, U.S. Department of Justice, Washington, DC, with whom were Tony West, Assistant Attorney General, and Jeanne E. Davidson, Director, for defendant. Major Joseph Krill, Department of the Army, Arlington, VA, of counsel.

## OPINION

FIRESTONE, Judge.

Pending before the court is the government's motion to dismiss or in the alternative motion for summary judgment in this case arising from a dispute regarding a Cooperative Research and Development Agreement ("CRADA" or "agreement")[1] between the plaintiff, D'Andrea Brothers LLC ("D'Andrea Brothers" or "D'Andrea") and the U.S. Army Natick Soldier Research, Development and Engineering Center ("Natick" or "NSC")[2]. The five-year agreement took effect in January 2004 and concerned the development and "commercialization" of nutri-

---

1. CRADAs are authorized by the Federal Technology Transfer Act ("FTTA"), 15 U.S.C. § 3710a (2006). The primary purpose of the FTTA is to encourage technology transfer from federal government-operated laboratories to private industry. See Chem. Serv, Inc. v. Envtl. Monitoring Sys. Lab.–Cincinnati of the U.S. EPA, 12 F.3d 1256, 1258 (3d Cir.1993). Under the FTTA, the director of any federal government-operated laboratory may enter into CRADAs with private entities. 15 U.S.C. § 3710a(a)(1). Congress has defined a "CRADA" as follows:

> As used in this section the term "cooperative research and development agreement" means any agreement between one or more Federal laboratories and one or more non-Federal parties under which the Government, through its laboratories, provides personnel, services, facilities, equipment or other resources with or without reimbursement (but not funds to non-Federal parties) and the non-Federal parties provide funds, personnel, services, facilities, equipment, or other resources toward the conduct of specified research or development efforts which are consistent with the missions of the laboratory; except that such term does not include a procurement contract or cooperative agreement as those terms are used in sections 6303 [(regarding procurement contracts)], 6304 [(regarding grant agreements)], and 6305 [(regarding other cooperative agreements)] of title 31, United States Code.

15 U.S.C. § 3710a(d)(1). A CRADA has been described as a "a new type of contractual relationship between a federal laboratory and a nonfederal party for research and development purposes" specifically intended "not to be a procurement contract, a grant agreement, or a cooperative agreement," as defined in other statutes. Chem. Serv., 12 F.3d at 1258.

2. The NSC provides soldier support by "researching, developing, fielding, and managing food, clothing, shelters, airdrop systems, and Soldier support items." The United States Army: About the NSC, http://www.natick.army.mil/about/index.htm. Natick's mission statement is as follows: "Conduct research, development, acquisition and sustainment to maximize combat effectiveness and survivability of freedom's defenders." Id.

tional or energy bars, including HooAH![3] bars, which had been developed by NSC for the Army. NSC had trademarked the Ho-oAH! name and package design. The CRA-DA, among other things, granted D'Andrea Brothers an exclusive license to the Ho-oAH!® trademark and the HooAH!® design (collectively "trademarks") "for the commercial sales and purposes described [in the CRADA]."[4] In the agreement, the government reserved to itself the right to use the trademarks for "governmental, non-commercial purposes."

In its complaint, the plaintiff alleges, *inter alia*, that the government breached the express terms of the CRADA, as well as the implied covenant of good faith and fair dealing, by failing to support D'Andrea Brothers's efforts to sell its HooAH! energy/nutritional bars to the military. The plaintiff alleges that Natick "sabotag[ed]" the plaintiff's efforts to sell its bars to the military. The plaintiff claims that sales to the military were contemplated as part of the "commercialization" goal of the CRADA. The plaintiff further alleges that Natick knowingly and intentionally allowed other companies to sell energy bars to the military using the HooAH! trademarks in violation of the plaintiff's exclusive license. Finally, the plaintiff alleges that the government breached its obligation under the CRADA to work with the plaintiff on improving, testing, and marketing its energy bars to the military and the general public.

The government initially filed a motion for judgment on the pleadings pursuant to Rule 12(c) of the Rules of the Court of Federal Claims ("RCFC"). The court converted the government's motion for judgment on the pleadings to a motion for summary judgment under RCFC 56.[5] The court rejected the government's motion for judgment on the pleadings on the ground that "the term 'commercial' or 'non-commercial,' is not defined in the CRADA and is unclear. Therefore, the Court finds that the meaning and scope of the terms 'commercial' or 'non-commercial'

is, with respect to the CRADA, ambiguous." (Order 1, April 16, 2009.)

The parties have completed discovery on liability. The government has moved to dismiss the plaintiff's case for lack of jurisdiction, on the grounds that the plaintiff has not stated a money-mandating claim and has stated a tort claim outside the jurisdiction of this court. In the alternative, the government seeks summary judgment on the plaintiffs' entire complaint. The court will address the government's motion to dismiss and motion for summary judgment seriatim below.

## I. MOTION TO DISMISS

### A. Background

These undisputed background facts are set forth to provide a context for both the motion to dismiss and the motion for summary judgment. The CRADA at issue in this case was the product of negotiations that began on January 16, 2003, when Christian D'Andrea contacted Vin Ranucci, a Natick attorney, to find out whether the HooAH! trademarks, which appear on energy bars distributed to soldiers, were available for license. Mr. D'Andrea had learned of the bars while filming a documentary about soldiers and stated that he was interested in marketing the bars to the public. Mr. Ranucci informed Mr. D'Andrea that the government had granted an exclusive license, subject to certain retained rights, for use of the trademarks to Sterling Foods Company ("Sterling") as part of a CRADA with that company. Natick terminated Sterling's trademark license effective June 30, 2003. Prior to terminating the trademark license with Sterling, Natick and D'Andrea Brothers began negotiating the subject CRADA. D'Andrea Brothers submitted a proposed Statement of Work to Natick on June 23, 2003, expressing the company's intent to achieve profitability and market penetration in meeting the goal of "Commercializing the HooAH! Bar." Numerous CRADA drafts were exchanged between

---

3. "HooAH!" is the battle cry of the U.S. Army.

4. The D'Andrea Brothers CRADA is Exhibit 1 to the Complaint.

5. The prior decision was issued by Judge Edward Damich on April 16, 2009. The case was transferred to Judge Firestone on April 21, 2010.

July 10, 2003 and January 12, 2004, when the parties finally executed a five-year CRADA. The stated objective of the CRADA was "Research and development leading to increased effectiveness (if possible) and availability of the HooAH!® Energy Bar." The CRADA granted D'Andrea Brothers a right to use the HooAH! trademarks, subject to certain rights reserved by the government. It is not disputed that during the negotiation process the government agreed to modify the language in the reservation of rights section to provide that the government's reservation was limited to use of the trademarks for "governmental, non-commercial purposes."

Prior to entering into a CRADA with the plaintiff, Natick also entered into a CRADA with another company, Sweet Productions, Limited ("Sweet"), on February 13, 2003. The Sweet CRADA allowed Sweet to "develop new shelf stable nutrient fortified food, snacks and candies" and "improve currently used shelf stable snacks and candies for use in combat rations, as well as in the commercial sector." This agreement had a minimum duration of one year and a maximum duration of five years. The CRADA with Sweet did not include any trademark license provisions.

### 1. The D'Andrea Brothers CRADA

The D'Andrea CRADA included the following "WHEREAS" terms preceding the agreement:

E. WHEREAS, D'Andrea possesses certain methodologies, information, know-how, and expertise pertaining to commercialization;

F. WHEREAS, NSC and D'Andrea are interested in further development and commercialization of the Technology; [6]

**6.** "Technology" is defined in the CRADA as "the intellectual property and data licenced in this agreement consisting of United States Trademark HooAH!® number 2,139,166 and United States Trademark HooAH!® and design number 2,139,-165."

**7.** "Subject Invention" is defined in the CRADA as "any invention of D'Andrea or NSC conceived or first actually reduced to practice in the performance of work under this CRADA."

G. WHEREAS, D'Andrea is willing to provide resources for further developments of the Technology—"development" is meant to include activities such as the exploration of applications of interest to the general public and the marketing of products related to the Technology. . . .

Regarding the trademarks, the CRADA includes the following provisions relevant to the dispute in this case:

6.6.1 *Grants.* NSC, on behalf of the Government, hereby agrees to grant and hereby grants . . . to D'Andrea an exclusive license in the field of use of energy bars/nutrition bars . . . subject to the reservation of an irrevocable, nontransferable, nonexclusive, royalty-free license to practice and have practiced the Subject Invention [7] on behalf of the U.S. Government. . . .

. . . .

6.9.1 *Grant of Rights.* Subject to the terms and conditions of this AGREEMENT, NSC hereby grants to PARTNER: [8]

(a) exclusive license rights to use the U.S. Trademarks HooAH!® number 2,139,166 and HooAH!® design number 2,139,165 in connection with the sale [9] of energy and nutrition bars and products where NSC may lawfully grant such license rights, for the term of this Agreement. . . .

. . . .

6.9.3 *Rights Reserved*

Notwithstanding the rights granted herein, NSC specifically reserves the rights to manufacture, have manufactured or USE the TECHNOLOGY for its own internal non-commercial purposes, including continuing research, development, testing, and all other USES.[10]

**8.** "Partner" in the CRADA refers to D'Andrea Brothers.

**9.** "Sale" is defined as "a WHOLESALE AND/OR RETAIL transaction of LICENCED PRODUCT(S) for which consideration is received by PARTNER. . . ." "Licensed Product" means "any product, method, or SERVICE in the field of use of energy/nutrition bars, the production, manufacture, SALE, lease, USE, or practice of which utilizes, in anyway, the TECHNOLOGY."

**10.** "Use/Using" is defined as "any form of prac-

All rights granted in this AGREEMENT are expressly granted subject to the nonexclusive, nontransferable, irrevocable, royalty-free rights of the GOVERNMENT to practice and have practiced the TECHNOLOGY for governmental, noncommercial [11] purposes on behalf of (A) the GOVERNMENT and (B) any foreign government or international organization.... This reservation specifically includes the right to engage in research, involving the non-commercial practice of the TECHNOLOGY, either solely with the GOVERNMENT Agencies or with one or more third parties.

. . . .

12.12 *Marking.*

. . . .

1. D'Andrea has an exclusive right to use the mark(s) for the commercial sales and purposes described herein. The terms and conditions of this CRADA shall apply to this right unless such terms and conditions are amended hereby. The U.S. Government retains the right to use or have used for or on behalf of the Government the mark(s) throughout the world for Government purposes.

The CRADA also includes terms regarding the plaintiff's ability to enter into a sublicense agreement:

6.9.2 Rights to Sublicense

The license rights granted under this Agreement shall specifically include the right for PARTNER to grant sublicenses. PARTNER agrees that any sublicense it grants to any third party shall be granted under the following conditions:

Sublicense rights shall be granted only to parties that can reasonably demonstrate a strong capability and specific plan for the effective development and marketing of the TECHNOLOGY, which shall benefit PARTNER's and NSC's mutual purposes and which shall be in accordance with

NSC's and PARTNER's intent to rapidly commercialize the TECHNOLOGY.

Regarding royalty payments to the government, the CRADA states:

4.1 *Earned Royalties.* In further consideration for the rights granted in this Agreement, PARTNER shall pay to NSC ... an earned royalty of four percent (4%) of PARTNER's GROSS REVENUES....

. . . .

4.3 *Pass Through Royalties.* In addition to all other royalties payable hereunder, PARTNER shall pay to NSC a "pass through royalty" on all royalty payments and all other consideration received by Partner for sales of LICENSED PRODUCT (S) by SUBPARTNER or for grants of sublicenses for the TECHNOLOGY by Partner to any SUBPARTNER. The pass through royalty shall be thirty three percent (33%) of all such consideration received by Partner....

The CRADA provided for a five-year term to be automatically renewed unless either party notified the other at least one year prior to the expiration of the term that it intended to unilaterally terminate the CRADA at the end of the first five-year period. Natick decided not to renew the CRADA in 2007. In December 2006, military personnel received an email from the Team Leader for the Office of the Director Staff and the Department of Defense Combat Feeding Directorate, Kathy Evangelos, to "cease and desist from distributing D'Andrea HooAH Bars, HooAH beverage and HooAH/OOHRAH bars until further notice." Relations with the plaintiff apparently broke down after the plaintiff in 2006 registered a trademark for "OoRAH!," the Marine battle cry, which the government was also using on its energy bar packaging. Around the same time, the government changed the name of the energy bars it purchased for both the

tice or utilization of the TECHNOLOGY, LICENSED PRODUCT[ ](S), or any portion thereof."

11. As discussed *infra* Part II.B.1, it is not disputed that the plaintiff had the phrase "non-commercial" added to this paragraph. In its correspondence with Natick, the plaintiff explained,

"otherwise the last sentence expressly reserves the right to practice (i.e. even commercialize) the TECH (which is explicitly the HooAH! energy bar trademark) with another private sector company ... thereby defeating the main purpose of document." (Def.'s Resp. to Pl.'s Proposed Findings of Fact No. 26.)

Army and Marines to "First Strike," avoiding use of either the HooAH! or OoRAH! trademarks.

### 2. The Military's Food Acquisition Process

The parties agree on the basic structure of the military's acquisition process for purchasing food used for troop feeding.[12] The process differs slightly based on whether the food is being procured for troop rations (Meals Ready to Eat or "MREs") or for distribution at military dining facilities. In the case of MREs, the military through the Defense Logistics Agency Troop Support, Defense Supply Center Philadelphia ("DSCP"), enters into contracts with MRE assemblers, which are private companies that then obtain or manufacture the food necessary to meet MRE requirements. MRE assemblers may procure name brand or non-name brand items, or they may produce the food items themselves. MREs are procured pursuant to Federal Acquisition Regulations ("FAR") Part 15.[13] In procuring food for military dining facilities, the military works with prime vendors that acquire name brand or non-named brand items through catalogs or manufacture products on their own. The DSCP is responsible for procuring this food through contracts with prime vendors in accordance with FAR Part 12.[14] The DSCP states on its website that "all sales of troop feeding (dining halls and ships) food products are through a worldwide network of commercial distributors" and that they use "a commercial system, therefore [their] customers have freedom of choice." New Item Introduction, http://www.dscp.dla.mil/subs/vendors/index.asp. It is not disputed that the Department of Defense Nutrition Committee 2005 identified the HooAH! bar as a "Commercial Off–The–Shelf Sports Bar."

### B. The Complaint

The plaintiff filed the present suit on April 17, 2008. The complaint sets forth three claims.

### 1. Count I: Breach of Express Contract

In its first count, the plaintiff claims that the government breached the CRADA by directly or indirectly purchasing energy bars with the HooAH! trademark from parties other than the plaintiff or the plaintiff's sublicensee in violation of the exclusive license provided to the plaintiff in the CRADA. The complaint states in relevant part:

> Natick deliberately breached their CRADA with the D'Andrea Brothers upon the realization that having very similar CRADAs with both Sweet and D'Andrea Brothers was a conflict. . . . Sweet's bar was . . . being ordered and sold commercially within the military community (with Natick's approval and knowledge), in violation of the exclusive license to the name HooAH which was given to the D'Andrea Brothers under their CRADA with Natick.

(Compl. ¶ 32.) The plaintiff further asserts that Natick breached the CRADA by "put[ting] out the word to various military factions not to cooperate with the D'Andrea Brothers or purchase the HooAH bar from the D'Andrea Brothers—a clear breach of their partnership agreement—'commercialization of the HooAH Bar.'" (Compl. ¶ 33.) In doing so, "Natick further knowingly and improperly breached their partnership with the D'Andrea Brothers by sabotaging efforts to promote commercialization and availability of the HooAH bar . . . ." (Compl. ¶ 34.)

For these alleged breaches the plaintiff seeks reliance damages of $3 million—the amount of its claimed investment in research, developing, and marketing the new energy

---

**12.** As discussed *infra* Part II.B.1 in the discussion regarding the government's motion for summary judgment, the parties' disagree in their characterization of the process and, in particular, whether the government's transactions with private sector food providers can be fairly characterized as "commercial" transactions.

**13.** FAR Part 15 governs the procedures for competitive and noncompetitive negotiated acquisitions.

**14.** FAR Part 12 provides policies and procedures unique to the acquisition of commercial items. The most basic definition of "commercial item" in the FAR is "[a]ny item, other than real property, that is of a type customarily used by the general public or by non-governmental entities for purposes other than governmental purposes." FAR 2.101.

bar formula—plus several million dollars more in loss of sales. (Compl. ¶¶ 27, 37.)

## 2. Count II: Breach of the Implied Covenant of Good Faith and Fair Dealing

The plaintiff next claims the government breached its duty of good faith and fair dealing rooted in the express terms of the CRADA. (Compl. ¶ 39.) The plaintiff maintains that Natick breached these implied covenants by entering into CRADAs with Sweet and Sterling and by "knowingly and intentionally" allowing those companies to sell bars "commercially" to the military in violation of D'Andrea Brothers license. (Compl. ¶¶ 40–42.) The complaint also states that Natick breached these duties when it:

(1) stopped working with their partner in improving, testing, producing, manufacturing, and marketing of the HooAH bar; (2) informed third parties that Natick was terminating their agreement with the D'Andrea Brothers when there were more than 2 years remaining on the CRADA; and (3) specifically telling third parties not to deal with the D'Andrea Brothers.

(Compl. ¶ 42.) For these alleged breaches, the plaintiff seeks the same damages as for Count I, listed above. (Compl. ¶ 44.)

## 3. Count III: Intentional Interference with Prospective Economic Advantage

Finally, the complaint contains a related tort claim. The plaintiff alleges, "An economic relationship existed between Plaintiff and the military community (i.e., military feeding community) containing a probable future economic benefit or advantage to the D'Andrea Brothers by way of sales of the HooAH bar in keeping with the CRADA agreement with Natick." (Compl. ¶ 46.) It further alleges:

Natick knew of the existence of the relationship and the military feeding community (commercially, for rations, subsistence, and garrison feeding), and were aware of or should have been aware that, if they did not act with due care, their actions would interfere with those relationships and cause the D'Andrea Brothers to lose, in whole or in part, the probable future economic benefit or advantage of the relationships.

(Compl. ¶ 46.) The complaint states that Natick intentionally interfered with these economic relationships through the intentional breaches of the CRADA alleged above. (Compl. ¶¶ 47–48.) The plaintiff seeks the same damages for this tort as the two contract claims listed above. (Compl. ¶ 49.)

## C. Standard of Review

■■■ The standard for ruling on a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1) is well-settled. The plaintiff bears the burden of establishing subject matter jurisdiction, *Alder Terrace, Inc. v. United States,* 161 F.3d 1372, 1377 (Fed.Cir.1998) (citing *McNutt v. Gen. Motors,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936)), and must do so by a preponderance of the evidence, *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed.Cir.1988). Because jurisdiction is a threshold matter, a case can proceed no further if a court lacks jurisdiction to hear it. *See Arbaugh v. Y & H Corp.,* 546 U.S. 500, 514, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006) ("[W]hen a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety." (citation omitted)); *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). *See generally John R. Sand & Gravel v. United States,* 552 U.S. 130, 128 S.Ct. 750, 169 L.Ed.2d 591 (2008). It is well-settled that when a court considers a motion to dismiss for lack of subject matter jurisdiction, it may look beyond the pleadings and "inquire into jurisdictional facts" to determine whether jurisdiction exists. *Rocovich v. United States,* 933 F.2d 991, 993 (Fed.Cir. 1991).

On July 15, 2010, following discovery on liability, the government filed a motion to dismiss the complaint in its entirety. The government argues that the court should dismiss Counts I and II of the complaint because the plaintiff has not pointed to any substantive provision of law authorizing the payment of money for breach of the CRADA. The government further argues that the Count III, the tort claim, should be dis-

missed as outside the scope of the court's subject matter jurisdiction.

### D. Discussion

### 1. The court has jurisdiction over the plaintiff's express and implied contractual claims.

█ The government argues that Counts I and II of this complaint should be dismissed because this court lacks jurisdiction over the plaintiff's express and implied contractual claims. Specifically, the government argues that under the Tucker Act, 28 U.S.C. § 1491 (2006), a plaintiff suing in this court must establish a substantive right to recover money damages and that money damages are not allowable for breach of a CRADA. According to the government, because the CRADA between Natick and the plaintiff includes no damages clause and does not identify any money mandating statute, the plaintiff's breach of contract claims based on the CRADA must be dismissed. The plaintiff argues in response that it does not matter whether the CRADA expressly provides for money damages because the CRADA is a contract and subject to the presumption that money damages are available as relief for a breach of contract with the government. Thus, the plaintiff argues, the court has jurisdiction to hear the case.

The Tucker Act states that the Court of Federal Claims possesses jurisdiction over claims "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon *any express or implied contract* with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (emphasis added). The government first argues, without reference to the reasoning of its assertion, that "[t]he CRADA between the United States and D'Andrea Brothers is clearly not a Govern-

ment contract ..." (Def.'s Mot. 10.) The court disagrees. The Federal Circuit has stated, "[A]ny agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the Government, specifically: mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government." *Massie v. United States,* 166 F.3d 1184, 1188 (Fed.Cir. 1999) (citing *Trauma Serv. Grp. v. United States,* 104 F.3d 1321, 1326 (Fed.Cir.1997)). Tested by these standards, the subject CRADA clearly meets the requirements for a contract as set forth by the Federal Circuit: it represents an offer and acceptance of rights and obligations (e.g. the plaintiff received an exclusive license for the use of the HooAH! trademarks in exchange for paying a royalty to the government), it involves the trading of consideration (the government agreed to share its expertise in preparing, packaging, and developing products and the plaintiff agreed to provide marketing research and take other steps needed to make the bars "commercial"), and the government does not dispute that the CRADA was signed by an official with authority to bind the government. In view of the foregoing, the court finds that the CRADA is a contract.[15]

█ Having established that the CRADA is a contract, the court must next address—assuming as we must that the government breached the CRADA—whether money damages are available. The government argues, based on the language of the FTTA and the language of the CRADA itself, that because federal funds may not be used to advance the purposes of the CRADA, money damages from the government are not available in the case of a breach of a CRADA.[16] The plaintiff argues, in response,

---

**15.** This court has previously found that a CRADA is a contract in at least one case. *Spectrum Sciences v. United States,* 84 Fed.Cl. 716, 735 n. 26 (2008) ("Recent jurisprudence confirms that a CRADA is a contract for purposes of the Tucker Act . . . ." (citing *Trauma Serv.,* 104 F.3d at 1326; *Bay View, Inc. v. United States,* 278 F.3d 1259, 1265–66 (Fed.Cir.2001); *Stovall v. United States,* 71 Fed.Cl. 696, 698 (2006))).

**16.** The government also argues that damages are not available because this case does not arise under the Contracts Disputes Act ("CDA"), citing *Rick's Mushroom Serv., Inc. v. United States,* 521 F.3d 1338 (Fed.Cir.2008). The government does not dispute that it is well-settled that the CDA does not provide the only basis for money damages for breach of contract cases under the Tucker Act.

that it is well-settled that money damages are presumed to be available for the breach of a contract with the government and therefore money damages should be available for breach of the subject CRADA. *See United States v. Winstar,* 518 U.S. 839, 885, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (plurality opinion) ("[D]amages are always the default remedy for breach of contract."); *Sanders v. United States,* 252 F.3d 1329, 1334 (Fed.Cir. 2001) ("It is no doubt also true that in the area of government contracts, as with private agreements, there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement.").

The court agrees with the plaintiff that the ordinary presumption of the availability of money damages applies in this case given the finding that the CRADA is a contract. The subject case is akin to others that the Federal Circuit has routinely included in the category of agreements falling within the court's Tucker Act jurisdiction, including the dozens of *Winstar* cases, spent nuclear fuel cases, low-income housing agreement cases, and other cases under various government grant programs. *Stovall v. United States,* 71 Fed. Cl. 696, 699 (2006) (citing, *inter alia, Winstar Corp. v. United States,* 64 F.3d 1531, 1539–40 (Fed.Cir.1995) (en banc); *Boston Edison Co. v. United States,* 64 Fed.Cl. 167, 178 (2005); *Franconia Assocs. v. United States,* 536 U.S. 129, 141, 122 S.Ct. 1993, 153 L.Ed.2d 132 (2002), *on remand,* 61 Fed.Cl. 718 (2004); *San Juan City College v. United States,* 391 F.3d 1357, 1361 (Fed.Cir.2004)). In each of these cases the court found a right to money damages even though the contract or grant was silent on the question.[17]

The government argues that the ordinary presumption in favor of money damages should not apply where, as here, Congress has made clear in the FTTA that public funds will not be made available as part of an agreement:

> [T]he term "cooperative research and development agreement" means any agreement between one or more Federal labora-

tories and one or more non-Federal parties under which the Government, through its laboratories, provides personnel, services, facilities, equipment, intellectual property, or other resources with or without reimbursement (*but not funds to non-Federal parties* ) and the non-Federal parties provide funds, personnel, services, facilities, equipment, intellectual property, or other resources toward the conduct of specified research or development efforts which are consistent with the missions of the laboratory; except that such term does not include a procurement contract or cooperative agreement as those terms are used in sections 6303, 6304, and 6305 of title 31....

15 U.S.C. § 3710a(d)(1) (2006) (emphasis added). Similarly, the CRADA itself states:

> [T]he [FTTA] among other technology transfer improvements has provided each Federal agency with the authority to permit the Director of Government-operated Federal laboratories to enter into CRADAs with Federal or non-Federal entities including private firms and organizations for the purpose of providing to or obtaining from collaborating parties, personnel, services, property, facilities, equipment or other resources (*but not funds of any Federal party* ) toward the conduct of specified research and development efforts....

(emphasis added). According to the government, when Congress has restricted the ability of federal laboratories to obligate government funds in connection with CRADAs, the ordinary presumption of the availability of money damages for a breach of a contract should not apply.

While it is no doubt true that the government cannot advance federal funds in connection with the work to be performed under a CRADA, the court does not agree with the government's assertion that the FTTA prohibits the payment of money damages if the government breaches a CRADA. To begin, it is clear from a review of the FTTA that

---

**17.** The government's reliance on cases involving non-appropriated fund instrumentalities ("NAF-Is") to suggest that money damages are not available because appropriated federal funds cannot be exchanged as part of the agreement is mis-

placed. It is beyond dispute that Natick is not a NAFI. Natick is operated with appropriated federal funds and employees paid with appropriated federal funds worked on the subject CRADA.

there is nothing in the Act that specifically immunizes the government from financial liability in the event of a government breach of a CRADA. The FTTA is silent with regard to remedies in the event of a breach of an agreement entered into under the Act. However, given the extensive licensing rights authorized by the FTTA, it is difficult to imagine that Congress did not intend to provide the government and its CRADA partners with reciprocal rights in the event that one or the other breached its duties under such agreements.

Indeed, the subject CRADA provides a dispute resolution mechanism but also expressly preserves each party's right to seek remedies available under the law: "nothing in this CRADA, precludes either party from pursuing resolution of a dispute using *other legal review available by law.*" (emphasis added). There is no reason to assume that the legal remedies contemplated by this provision do not include actions for monetary damages. Certainly the government reserved its right to seek money damages from D'Andrea Brothers in the event D'Andrea Brothers failed to pay royalties. Indeed, the government has filed a counterclaim in this very case. Certainly, D'Andrea Brothers also has the right to seek money damages where, as is alleged here, the government did not live up to its end of the bargain and allowed other companies to sell HooAH! bars in violation of D'Andrea Brothers' alleged exclusive licensing rights under the CRADA.

For all of the foregoing reasons, the court finds that the CRADA is subject to the normal presumption that money damages will be available in the event of the government's breach of a contract with a private plaintiff. As such, this court has jurisdiction under the Tucker Act to hear the plaintiff's Count I and II express and implied breach of contract claims.[18]

### 2. The court has jurisdiction over the plaintiff's tort claim.

■ The government also moves to dismiss Count III of the plaintiff's complaint, arguing that this claim sounds in tort and is thus beyond the scope of this court's jurisdic-

tion. The plaintiff argues that where a tort claim is based upon a breach of contract claim, as here, it is properly within the jurisdiction of the Court of Federal Claims.

■ As stated above, under the Tucker Act, this court possesses jurisdiction over claims "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). While ordinarily this court does not have jurisdiction over tort claims, the Federal Circuit has held, "[W]here a tort claim stems from a breach of contract, the cause of action is ultimately one arising in contract, and thus is properly within ... jurisdiction of the Court of Federal Claims." *Awad v. United States,* 301 F.3d 1367, 1372 (Fed.Cir.2002); *see also Wood v. United States,* 961 F.2d 195, 198 (Fed.Cir. 1992) ("If an action arises 'primarily from a contractual undertaking,' jurisdiction lies in the [Court of Federal Claims] 'regardless of the fact that the loss resulted from the negligent manner in which defendant performed its contract.'" (quoting *San Carlos Irrigation and Drainage Dist. v. United States,* 877 F.2d 957, 960 (Fed.Cir.1989))). The inquiry into whether a tort claim stems from a breach of contract involves considering whether the "[tort] claims are separate from and independent of the government's obligations under the [contract]" and whether the government's duty allegedly breached "ar[o]se from the government's obligations under the agreement [or] from tort law." *Phang v. United States,* 388 Fed.Appx. 961, 963 (Fed.Cir.2010), *aff'g* 87 Fed.Cl. 321 (2009). Put differently:

> The test for jurisdiction in this Court, under the Tucker Act, is whether there has been a "tortious" breach of contract, rather than a tort independent of the contract.... [T]here must be a direct connection between the Government's contractual obligations and the alleged tortious conduct. It is not jurisdictionally sufficient if

---

**18.** Because the court finds that this court has jurisdiction to hear plaintiff's case, plaintiff's mo-

tion to strike the government's NAFI argument is **DENIED–AS–MOOT.**

the alleged tortious conduct is merely "related" in some general sense to the contractual relationship of the parties.

*H.H.O., Inc. v. United States,* 7 Cl.Ct. 703, 706–07 (1985) (citing *L'Enfant Plaza Properties, Inc. v. United States,* 645 F.2d 886, 892 (Ct.Cl.1981)).

In this case, the plaintiff alleges in Count III that:

> Natick knew of the existence of the relationship and the military feeding community (commercially, for rations, subsistence, and garrison feeding), and were aware of or should have been aware that, if they did not act with due care, their actions would interfere with those relationships and cause the D'Andrea Brothers to lose, in whole or in part, the probable future economic benefit or advantage of the relationships.

(Compl. ¶ 46.)

The government argues that the plaintiff's claim for intentional interference with prospective economic advantage must be dismissed because "it relies upon its incorrect assumption that it possesses the right to sell products using the HooAH! trademark to the military feeding community." (Def.'s Mot. 38.) According to the government, the CRADA only gave the plaintiff the right to use the trademarks in connection with "commercial" sales to the public, which the government contends does not include sales to the military feeding community. Thus, the government argues, the tort claim is too attenuated from the contract claim to provide jurisdiction to the court.

The plaintiff argues in response that its tort claim is related to the contract claim because the plaintiff reads the CRADA to include sales to the military. The plaintiff argues therefore that there is a clear nexus between the breach of contract claim and the tort claim because the government "encourag[ed] and allow[ed] third-parties to sell HooAH! bars in violation of the exclusive license ... granted to the plaintiff." (Pl.'s Resp. 39.)

The court finds that the plaintiff has based its tort claim on the CRADA and therefore there is a sufficient nexus between the contract claim and tort claim to support jurisdiction. Whether the CRADA gave the plaintiff an exclusive license to use the HooAH! trademarks for all sales, including sales to the military, involves a question of contract interpretation that will be addressed on summary judgment below.

## II. MOTION FOR SUMMARY JUDGMENT

As noted above, the government has moved for summary judgment on the merits of Claims I and II on the grounds that the plaintiff's claims are based on a misreading of the CRADA. The government argues that it is entitled to summary judgment with respect to the plaintiff's breach of contract claims because the undisputed facts show that the HooAH! trademark license granted to the plaintiff covered only "commercial" sales to the general public and that the plaintiff has based its entire claim on sales to the military. The government argues that under the express terms of the CRADA the government reserved to itself the right to use the HooAH! trademarks for government purposes and thus it did not breach the CRADA when it purchased bars with a HooAH! label from other entities for troop feeding purposes. The government also argues that it is entitled to summary judgment with regard to the plaintiff's claim regarding a breach of the covenant of good faith and fair dealing because the plaintiff has failed to put forth facts to show how (1) purchasing HooAH! bars from other companies, (2) "failing to partner" with the plaintiff, or (3) making negative comments about the plaintiff to certain government personnel and others resulted in any damages to the plaintiff. The government contends that the plaintiff has failed to present any evidence to show that the government interfered with the plaintiff's ability to "commercialize" the HooAH! bar, meaning market and sell it to the general public.

### A. Standard of Review

Pursuant to RCFC 56, summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine

issue as to any material fact and that the movant is entitled to judgment as a matter of law." RCFC 56(c)(1); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1283 (Fed.Cir.2008); *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed.Cir.2001) (citation omitted). In considering a motion for summary judgment, the court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. 2505. "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Lathan Co., Inc. v. United States*, 20 Cl.Ct. 122, 125 (1990); *Casitas Mun. Water Dist.*, 543 F.3d at 1283.

**B. Discussion**

**1. The undisputed facts establish that the government did not breach the express terms of the CRADA by allowing other companies to use the HooAH! trademarks for sales to the military.**

 Count I of the complaint focuses on the plaintiff's claim that under the terms of the licensing agreement between itself and the government, as set forth in the CRADA, the plaintiff secured the exclusive right to use the HooAH! trademarks for all sales, including sales to the military, where the bars were purchased through a private vendor. The government does not dispute that it allowed other companies to use the HooAH! trademarks in connection with HooAH! bars manufactured for military purposes. The government argues that it retained the right to do so under the CRADA. The government argues that regardless of whether sales to the government came through commercial vendors, under the terms of the CRADA the government reserved to itself the right to use or have others use the HooAH! trademarks for "any governmental purpose."

In this connection, the following facts are not disputed. Military dining halls and ships purchase food products through a worldwide network of commercial distributors for troop feeding. The DSCP, in accordance with FAR Part 12, contracts with prime vendors to provide commercial and non-commercial items in a catalog from which military dining halls and ships can order. DSCP is never involved in the prime vendor's relationship with the prime vendor's subcontractors.

With regard to MREs, the government procures these items pursuant to FAR Part 15 by contracting with MRE assemblers to produce a meal kit that meets certain caloric and other requirements, but the assemblers do not have to include any specific product. Like prime vendors, MRE assemblers may either manufacture food items themselves or subcontract with others to produce the food items for MREs.

Using these procurement vehicles the government purchased bars with the HooAH! trademarks from various manufacturers, including Sweet, with whom Natick had a separate CRADA. In its response to interrogatories, the government admitted:

During the period of January 2004–January 2009, DSCP bought MREs containing HooAH bars from Ameriqual, Sopacko, and Wornick. These MRE assemblers purchased the HooAH! Bars in order to satisfy the DSCP orders for MREs containing HooAH bars as "contractor furnished material" components.

During that same period, DSCP bought HooAH bars directly from Sweet Productions for resale to the Federal Emergency Management Agency.

During this period, DSCP also bought HooAH bars directly from Public Warehousing Company as part of DSCP's subsistence prime vendor program for Kuwait/Iraq.

The government acknowledges that some items purchased by DSCP vendors and MRE assemblers are "commercial items," such as "M & Ms®" and "Cheezits®."

 Contract interpretation begins with the language of the written agreement. *NVT Techs., Inc. v. United States*, 370 F.3d

1153, 1159 (Fed.Cir.2004). When interpreting a contract, courts consider the contract as a whole and interpret it in such a way that harmonizes and gives meaning to all terms, rather than leaving a portion of the contract useless, inexplicable, void, or superfluous. *Id.* Where a contract is ambiguous, the court is authorized to consider extrinsic evidence to determine the intent of the parties. *Daewoo Eng'g and Const. Co. v. United States,* 557 F.3d 1332, 1337 (Fed.Cir.2009) (citing *Teg–Paradigm Envtl., Inc. v. United States,* 465 F.3d 1329, 1338 (Fed.Cir.2006) ("When a provision in a contract is susceptible to more than one reasonable interpretation, it is ambiguous, and we may then resort to extrinsic evidence to resolve the ambiguity."); 11 Richard A. Lord, Williston on Contracts § 30:7 (4th ed. 1999) ("Where a written contract is ambiguous ... the fact finder must interpret the contract's terms, in light of the apparent purpose of the contract as a whole, the rules of contract construction, and extrinsic evidence of intent and meaning.")). In addition, where, as here, the agreement is authorized by a statute, the court should look to the statute. As the court in *Spectrum Sciences v. United States,* 84 Fed.Cl. 716 (2008) explained, "[U]nlike private contractual undertakings, the contract here was specifically authorized by legislation passed by Congress, requiring the court to consider that legislation in construing it." *Spectrum Sciences,* 84 Fed.Cl. at 735 (citing *Bennett v. Kentucky Dep't of Educ.,* 470 U.S. 656, 669, 105 S.Ct. 1544, 84 L.Ed.2d 590 (1985); *Barseback Kraft AB v. United States,* 121 F.3d 1475, 1480–81 (Fed.Cir.1997); *Franconia Assocs. v. United States,* 61 Fed.Cl. 718, 731 (2004); *Cuyahoga Metro. Hous. Auth. v. United States,* 57 Fed.Cl. 751, 761 (2003)).

Here, for the reasons discussed below, the court finds that the government expressly reserved the right to use the HooAH! trademarks for any governmental use without limitation, and therefore the government did not breach the terms of the CRADA by allowing other companies to use the HooAH! trademarks on bars purchased by the DSCP for dining halls, MREs, or other governmental entities. The critical question is not whether the government acquired the bars through a commercial vendor but whether the bars manufactured by others using the trademarks were purchased for a governmental purpose.[19]

We begin with the plain language of the CRADA, which states that the purpose of the agreement is to give the plaintiff the right to "commercialize" the HooAH! bar by marketing the bar to the "general public." The "Whereas" clauses include:

> D'Andrea possesses certain methodologies, information, know-how, and expertise pertaining to commercialization
>
> . . .
>
> D'Andrea is willing to provide resources for further development of the Technology—"development" is meant to include activities such as the exploration of applications of interest to the *general public* and the marketing of products related to the Technology.

(emphasis added).

The CRADA therefore was focused on D'Andrea finding ways to sell the bars to the general public separate from current use of the trademarks for the government's own purposes. This is confirmed by the various clauses reserving rights for the government. First, Section 6.9.3 of the CRADA states:

> NSC specifically reserves the rights to manufacture, *have manufactured or USE the TECHNOLOGY for its own internal non-commercial purposes, including* continuing research, development, testing, and *all other USES.*
>
> . . . .
>
> All rights granted in this AGREEMENT are expressly granted subject to the non-exclusive, nontransferable, irrevocable, royalty-free rights of the GOVERNMENT to *practice and have practiced the TECHNOLOGY for governmental, non-commercial purposes* on behalf of ... the GOVERNMENT

---

**19.** In this regard, the court finds that regardless of whether the terms commercial and non-commercial are ambiguous, the key question is whether the government reserved to itself the right to use the trademarks for governmental purposes and whether the use of the trademarks by companies other than D'Andrea Brothers violated the CRADA.

. . . .

(emphasis added). As noted *supra* note 11, plaintiff inserted the words "non-commercial" into Section 6.9.3 quoted above to ensure that other companies could not "commercialize" the trademarks. However, insertion of the words "non-commercial" did not mean, as the plaintiff argues, that the government gave up the right to use the HooAH! trademarks for bars the government provided to its soldiers. The government expressly reserved to itself in Section 6.9.3, the right to practice the technology for "internal . . . purposes, including . . . all . . . USES." The broad meaning of the reservation is demonstrated by an examination of each of the relevant CRADA definitions. "USE" is defined in Section 1.16 of the CRADA to mean *"any form of practice or utilization of the TECHNOLOGY*, LICENSED PRODUCT(S), or any portion thereof." (emphasis added). "LICENSED PRODUCT" in turn is defined in Section 1.12 of the CRADA to mean "any product, method, or SERVICE in the field of use of energy/nutrition bars, the production, manufacture, SALE, lease, USE, or practice of which utilizes, in any way, the TECHNOLOGY [ (i.e. the HooAH! trademarks) ]." In this connection, it is significant that the term "SALE" is defined separately from "USE" in the CRADA. "SALE" is defined in Section 1.13, to mean, "a *WHOLESALE AND/OR RETAIL transaction* of LICENCED PRODUCT(S) *for which consideration is received by PARTNER* [ (i.e. D'Andrea Brothers) ]." (emphasis added).

In view of these definitions, it is clear that USE of the trademarks by the government includes "any form of practice or utilization of the [trademarks]," which would include utilization of the trademarks by others manufacturing energy bars for the government. The government does not buy energy bars for dining facilities and MREs through a "WHOLESALE AND/OR RETAIL" "SALE." Rather, it acquires energy bars through procurement mechanisms governed by the FAR Part 12 or Part 15, respectively. Under CRADA Section 6.9.1(a), the plaintiff received an exclusive license "in connection with the *sale [ (i.e. wholesale and/or retail sale) ]* of energy/nutrition bars." (emphasis added). Because "SALE" is not defined to include government procurements, but only includes wholesale and retail transactions, the plaintiff's exclusive trademark license for "the sale of energy/nutrition bars" does not extend to the government's purchasing of MREs and food for dining facilities through the government procurement process.[20] Therefore, the reservation of rights in Section 6.9.3, which preserves the government's right to "USE" the trademarks for its own purposes without limitation, includes the government's right to use the trademarks in connection with its procurement of energy bars.

The plaintiff's contention that the "USES" reserved in Section 6.9.3 were limited to research, development, and testing, and thus do not include the feeding of troops with energy bars, is not supported by the plain language of the reservation. The reservation includes "all other USES." As such, the government's right to use the trademarks for *all* governmental uses are included within the reservation of rights provision.

This view is confirmed by Section 12.12 of the CRADA, which states, "The U.S. Government retains the right to *use or to have used* for or on behalf of the Government the mark(s) throughout the world *for Government purposes.*" (emphasis added). There is nothing in this provision to support the plaintiff's claim that the CRADA should be read to limit government purposes to only research, development, and testing.

 The plaintiff's reading of the reservation of rights provisions is also inconsistent with the FTTA, which requires, in relevant part, that the government retain rights in any license it grants to a collaborating party. More specifically, in connection with a patent obtained by the government, the government must retain "[a] nonexclusive, nontransfera-

---

**20.** Indeed, "acquisition" and "procurement" are defined in the FAR as, "[T]he acquiring by contract with appropriated funds of supplies or services (including construction) by and *for the use of the Federal Government* . . ." and are thus distinguishable from wholesale or retail transac-

tions. FAR 2.1 (emphasis added). Even when the government procures "commercial items" pursuant to FAR Part 12, those acquisitions must still follow a proscribed procurement process as set forth in that Part.

ble, irrevocable, paid-up license ... to practice the invention or have the invention practiced throughout the world by or on behalf of the Government." 15 U.S.C. § 3710a(b)(1)(A).[21] Although this statutory provision addresses patents and is therefore only relevant by analogy, the statutory language demonstrates that the FTTA contemplates that the government in a CRADA may not bargain away its own right to use any license obtained by the government for its own purposes. This court must construe the CRADA consistent with its statutory purpose. *Spectrum Sciences,* 84 Fed.Cl. at 735 (citing *Bennett,* 470 U.S. at 669, 105 S.Ct. 1544; *Barseback Kraft,* 121 F.3d at 1480–81; *Franconia Assocs.,* 61 Fed.Cl. at 731; *Cuyahoga,* 57 Fed.Cl. at 761).

In view of the foregoing, the court finds that the government did not breach the CRADA by allowing other manufactures to produce HooAH! bars for the military. There can be no serious dispute that the HooAH! bars the government acquired from Sweet and other manufacturers for MREs and dining halls were made and acquired by the government for a "Government purpose[ ]." Food for troops or emergency rations distributed by the Federal Emergency Management Agency are plainly "for or on behalf of the Government."[22] The court finds that the government is entitled to summary judgment on Count I, the express breach of contract claim.[23]

**2. The undisputed facts establish that the government did not breach the covenants of good faith and fair dealing by entering into CRADAs with Sweet or Sterling.**

 "The duty of good faith and fair dealing is inherent in every contract." *Pre-*

cision Pine & Timber, Inc. v. United States, 596 F.3d 817, 828 (Fed.Cir.2010) (citing Restatement (Second) of Contracts § 205 (1981)). The covenant "imposes on a party ... the duty ... to do everything that the contract presupposes should be done by a party to accomplish the contract's purpose." *Stockton E. Water Dist. v. United States,* 583 F.3d 1344, 1365 (Fed.Cir.2009) (quoting 30 Richard A. Lord, Williston on Contracts § 77.10 (4th ed. 1999)). Further, this duty requires a party to not interfere with another party's rights under the contract. Restatement (Second) of Contracts § 205 at cmt. d. The covenant applies to the United States as it does to any other party. *First Nationwide Bank v. United States,* 431 F.3d 1342, 1349 (Fed.Cir.2005).

 "Not all misbehavior, however, breaches the implied duty of good faith and fair dealing owed to other parties to a contract." *Precision Pine,* 596 F.3d at 829 (citing *First Nationwide,* 431 F.3d at 1350 (noting that not all governmental action that affects existing government contracts violates the implied duty of good faith and fair dealing)). The Circuit further explained:

> Cases in which the government has been found to violate the implied duty of good faith and fair dealing typically involve some variation on the old bait-and-switch. First, the government enters into a contract that awards a significant benefit in exchange for consideration. Then, the government eliminates or rescinds that contractual provision or benefit through a subsequent action directed at the existing contract.

---

**21.** 15 U.S.C. § 3710a(b)(2) includes the same language for inventions made by collaborating parties but adds, "for research or other Government purposes."

**22.** The distinction the government has drawn between the Army Airforce Exchange Service ("AAFES") and the military feeding components is meaningful and consistent with the court's holding. The AAFES runs retail centers where name-brand items are sold to both members of the public and members of the military, and thus falls within the plaintiff's exclusive trademark license for "SALE[s]." In contrast, the military feeding components procure both branded and

non-branded foods that are not sold but provided to members of the military in military rations or at dining facilities.

**23.** Similarly, to the extent the plaintiff's breach of the covenant of good faith and fair dealing claims in Count II and tort claims in Count III are based on the plaintiff's claim that the government breached the CRADA by allowing other manufacturers to use the HooAH! trademarks for bars used by the military or other government entities, the government's motion for summary judgment is likewise granted.

*Id.* at 829 (citing *First Nationwide*, at 1350–51; *Centex Corp. v. United States*, 395 F.3d 1283, 1304–07 (Fed.Cir.2005); *Hercules, Inc. v. United States*, 516 U.S. 417, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996)). A party must not "act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex*, 395 F.3d at 1304. Thus, the government may be liable for damages when the government's action is "specifically designed to reappropriate the benefits the other party expected to obtain from the transaction, thereby abrogating the government's obligations under the contract." *Precision Pine*, 596 F.3d at 829 (citing *Centex*, 395 F.3d at 1311). "Although the implied covenant of good faith and fair dealing cannot be used to expand a party's contractual duties beyond those in its express contract, the object of the contract is presumed to be subject to the covenant of good faith and fair dealing and the exact prohibited conduct need not be expressed." *Rivera Agredano v. United States*, 70 Fed.Cl. 564, 574 (2006) (citing *Centex*, 395 F.3d at 1306).[24]

■ Tested by these standards, the court agrees with the government that it did not breach the covenants of good faith and fair dealing by entering into a CRADA with Sweet during the same period that the D'Andrea Brothers CRADA was in place or by entering into a CRADA with Sterling for use of the HooAH! trademarks during a period that did not overlap with the plaintiff's CRADA. The Statement of Work for the CRADA with Sweet states that the agreement's objective is, "To develop new shelf stable nutrient fortified food, snacks and candies. To improve currently used shelf stable nutrient fortified foods, snacks and candies in combat rations, as well as in the commercial sector." (Def.'s Prop. Findings of Uncont. Fact ("DPFUF") App. 53.) The government entered into this agreement on February 13, 2003, nearly a full year before the plaintiff's CRADA took effect. The court finds that while the Sweet CRADA's scope, "fortified foods, snacks and candies," may encompass "energy bars/nutrition bars," the mere fact that the government entered into these two

similar agreements to cooperate with private companies for "commercialization" of foods does not give rise to a breach of the covenants of good faith and fair dealing.

■ The same is true of the Sterling CRADA. The Sterling CRADA's objective encompassed "shelf stable bread and other shelf stable baked products" and was amended to provide an exclusive right to use the HooAH! trademarks for "commercial sales." (DPFUF App. 32, 37.) While this CRADA, unlike the Sweet CRADA, included a grant of the use of the HooAH! trademarks, it is undisputed that Natick terminated Sterling's trademark license effective June 30, 2003, more than six months prior to entering into the plaintiff's CRADA. The plaintiff has not alleged any facts to show that Sterling continued to use the trademarks after that date. Thus, there is no evidence upon which the court can find that the government "interfer[ed] with the plaintiff['s] enjoyment of the benefits contemplated by the contract," by entering into CRADAs with Sweet and Sterling. The government is entitled to summary judgment on this portion of the plaintiff's breach of good faith and fair dealing claim.

**3. Disputed issues of material fact preclude summary judgment on the plaintiff's claim that the government breached its obligation to cooperate with its CRADA partner and to not "bad-mouth" the plaintiff to others within and outside the government.**

■ The plaintiff also alleges that the government breached the covenants of good faith and fair dealing when it "stopped working with [D'Andrea Brothers] in improving, testing, producing, manufacturing and marketing of the HooAH bar." (Compl. ¶ 42.) The plaintiff refers to this as a "failure to partner" with D'Andrea Brothers, stating that the government "refused to work with" the plaintiff. (*Id.*) The government seeks summary judgment on this claim, stating that the government performed all of its

---

24. The court notes that the standard for showing a breach of the covenant of good faith and fair dealing is different from that for showing that the government has acted in bad faith. *See Centex*, 395 F.3d at 1304–06; *Rivera Agredano*, 70 Fed. Cl. at 574 n. 8.

obligations under the agreement and the plaintiff has failed to produce any facts to show that it failed to perform any of its obligations under the CRADA.

The following facts, disputed and undisputed, are relevant to this issue. Disputes between the plaintiff and the government began in 2006 after the plaintiff filed for the trademark "OoRAH!" for energy bars and the mark was registered in their name on November 7, 2006. The government had apparently been using the OoRAH! label for bars given to marines and after the plaintiff trademarked the name the government changed the name of the bars it distributed to soldiers and marines to "First Strike." Following the decision to change the name of the bar to "First Strike," the government issued an email stating:

> Team, Cease and desist from distributing D'Andrea HooAH Bars, HooAH beverage and HooAH/OOH–RAH bars until further notice. Trademark/licensing issues ongoing. Depending on the result, we may likely revert to the HooAH (only) bars and will need to place an order—but the vendors are on hold also, so don't buy anything yet.

(Pl.'s Prop. Findings of Uncont. Fact ("PPFUF") App. 221.) In her September 3, 2009 deposition, Ms. Evangelos stated regarding this email, "[T]here were these trademark issues going on, and we just needed to stop using them, we didn't know what was going to happen with all of this at the time. . . . I just put a hold on everything, just so we could clarify whatever was going on." (*Id.* App. 210.) A May 18, 2007 email from Ms. Evangelos to Stephen Moody (Team Leader, Individual Combat Rations Team at Natick, Combat Feeding Directorate) states, "[W]e may be opening up a huge can of worms with D'Andrea after they find out we are producing the [First Strike] Bar. They have lawyers. But so does the army." (*Id.* App. 219.) In her deposition, Ms. Evangelos stated that this email referred to the fact that the military "had changed the name of the HooAH/OorAH bar to First Strike bar,"

coinciding with the time frame that "notice had been given to Christian D'Andrea that the CRADA was not going to be renewed." (*Id.* App. 216–17.)

Loraine Salerno, former Army Center of Excellence Subsistence ("ACES") employee, stated in her July 30, 2009 declaration that she met with Christian and Paul D'Andrea in or around August 2007 as part of the process of "reviewing the issues presented to [ACES] between the D'Andrea Brothers LLC and the government." (*Id.* App. 166.) She stated, "As set forth in my August 22, 2007 memorandum, as a result of a contract dispute with the D'Andrea Brothers, the government changed the name of the Hooah bar to the First Strike bar." (*Id.* App. 167.)

The parties dispute whether the government "failed to communicate with the D'Andrea Brothers after the contract dispute." In her September 3, 2009 deposition, Ms. Evangelos agreed that there came a point in time when she was not communicating with Christian D'Andrea, "sometime in 2007." (*Id.* App. 210.) Ms. Salerno's declaration from July 2009 states, "[T]he government failed to communicate with the D'Andrea Brothers after the dispute and elected not to renew the [CRADA] with them." (*Id.* App. 167.) Her August 22, 2007 memorandum states:

> Since this situation has occurred the company has not been able to speak with anyone at Natick which makes it very frustrating for the company. Calls are not being returned. Per Natick, they are not renewing the CRADA with the company and feel they should not communicate with the company.

(*Id.* App. 169.)

Based on this record, there are disputed facts which preclude the court from granting summary judgment to the government on whether the government "fail[ed] to partner" or "refused to work with" with D'Andrea Brothers or hindered the plaintiff's performance of the CRADA by changing the name of the bars the military used for troop feeding or by otherwise.[25] As stated above, the covenant of good faith and fair dealing "imposes

---

25. At oral argument counsel for the United States explained that the government wanted the plaintiff to market the HooAH! bars to the gener-

al public so that soldiers would recognize the bars when they saw them in their rations or at dining halls. Tr. of Oral Arg. at 45.

on a party ... the duty ... to do everything that the contract presupposes should be done by a party to accomplish the contract's purpose," *Stockton E. Water Dist.*, 583 F.3d at 1365, and requires that a party must not "act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex*, 395 F.3d at 1304. To the extent Count II of the plaintiff's complaint is based on allegations that the government abdicated its obligation to cooperate to fulfill the CRADA's objectives, the government's motion for summary judgment must be denied.

The plaintiff also claims that the government breached the covenants of good faith and fair dealing by "bad-mouthing" D'Andrea Brothers to other members of the military community and third parties in the private sector. The government, while not disputing that it made negative comments for the purpose of this motion, argues that nothing in the CRADA precluded members of the military from making negative comments about the plaintiff to other members of the military community, and that such comments did not frustrate the purpose of the CRADA because the purpose of the CRADA was not to assist the plaintiff in selling to the military community.[26] The government argues that any negative comments made to third parties had no effect on CRADA performance because these non-governmental entities were not potential purchasers of the plaintiff's products, but were competitors. Further, the government contends that any negative statements were a reasonable reaction to the plaintiff's efforts to prevent the government from using the HooAH! and OoRAH! trademarks, and were not made with the intent of hindering or delaying the plaintiff's performance of the CRADA. The plaintiff responds that the private sector parties to whom the government made negative comments were potential sub-licensees of the HooAH! trademarks and thus potential customers of the plaintiff.

As examples of the alleged bad-mouthing, the plaintiff has identified statements by mil-

itary to other military personnel (often unidentified because of redactions) and third parties, the substance of which the government does not dispute.

A March 14, 2005 email from Andrew Rosenblatt of the Beanstalk Group, the Army's trademark licensing agency, to Scott Chafin, a Trademark and Copyright Attorney for the Army Legal Services Agency, states:

> While I know they've only licensed the Hooah name—the association with the Army and Natick, serve virtually the same purpose as the army license; at least as far as trying to find someone else to take the Army license. There is another 'Army' product out there and could discourage potential suitors.

(PPFUF App. 195.) A January 11, 2007 email between Mr. Chafin and Andy Oppenheimer of Sweet Productions states, "Natick has notified D'Andrea Brothers, LLC that the CRADA ... will not be renewed once it expires.... We will ask our trademark licensing agency, The Beanstalk Group, to begin prospecting for a license for the 'HooAH!' trademark in connection with energy bars." (*Id.* App. 187.) A June 7, 2007 email from Mr. Chafin to Cline H. White, an attorney for Lone Star Specialty Tees, states, "D'Andrea has been a nightmare for us, and for the Marines; I'm for anything that can be done to bring him down several notches." (*Id.* App. 193.) A June 12, 2007 email from Mr. Moody to Dr. Daniel Johnson, faculty at the Consortium for Health and Military Performance ("CHAMP") within the military's Uniformed Services University, Gerald Darsch, Director of the Department of Defense Combat Feeding Program, and Ms. Evangelos stated, "It is extremely concerning to me that a [Army Training and Doctrine Command ("TRADOC")] dietician would conduct a 'field test and survey' with basic trainees that amounts to little more than a marketing scheme for D'Andrea Brothers." (*Id.* App. 175.) A June 15, 2007 email from Mr. Darsch to Dr. Johnson stated, "The CRADA that

---

**26.** Section 12.11 of the CRADA states that the CRADA does not authorize endorsements, but "D'Andrea has the right to use any factual information regarding formal relationships between Natick/the U.S. Government...." To the extent

certain persons within the government were keeping D'Andrea Brothers from securing formal relationships with members of the military community, some of the plaintiff's rights under the agreement were potentially lost.

existed between the Natick Soldier RDEC and the D'Andrea Brothers is in the process of termination for reasons that are not really fruitful to discuss at this time." (*Id.* App. 171.) A second June 15, 2007 email from Mr. Darsch to James Lecollier of the DSCP, Ms. Evangelos, and Mr. Moody states, "We have a potential situation brewing, which may add another log to the D'Andrea fire.... I'm attempting to turn off the Uniformed Health Services University, who appears to be tied at the hip with DA Boyz with a whole host of specious claims of a better product." (*Id.* App. 189.) A July 20, 2007 email between to unknown individuals in the army states, "[T]his is a long running issue with this company. Yes, there are legal issues regarding the name and Natick has not been working with them." (*Id.* App. 184.) An August 24, 2007 email from Mr. Chafin and Mr. White states:

> The email below is one that you forwarded me back in April, when you first contacted me about D'Andrea's demands against Lone Star. Yesterday, I received a message from Steve Crawford, president of U.S. Allegiance, another AAFES vendor and Army licensee, who informed me that D'Andrea has made identical demands on U.S. Allegiance (like Lone Star, one of our better licensees). I cannot give legal advice to any of our licensees, but I am advising Steve of the Lone Star suit vs. D'Andrea.... [T]he Army intends to provide whatever evidentiary support it can.

(*Id.* App. 191.) An October 31, 2007 email between unknown TRADOC personnel states, "Natick is communicating to [D'Andrea Brothers] through their lawyers. ACES has been asked not to communicate with Company." (*Id.* App. 177.)

Paul D'Andrea testified in his September 16, 2009 deposition that Helen Richardson (who appears to be a government employee) said in around August 2007 that Natick had been "badmouthing us and our bar." (*Id.* App. 180.) "[W]e heard from [CHAMP] that we had been badmouthed, our product, and we had been told caveat emptor, buyer beware, when dealing with D'Andrea Brothers." (*Id.* App. 180.) The portion of this deposition provided by the plaintiffs does not indicate to whom these statements were made.

The court finds that the plaintiff has established that there are disputed issues of fact regarding its claim that the government violated its duty of good faith and fair dealing by bad-mouthing the plaintiff to others within and outside the government.

As discussed above, a party must not "act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex,* 395 F.3d at 1304. In order to reap the benefits of the CRADA and commercialize the product, the plaintiff expected that it would be able to test its product within the military and use factual information regarding its relationships with the military for commercial benefit. *See supra* note 26. Therefore, the plaintiff has put in issue the government's good faith and fair dealing by identifying circumstances of bad-mouthing their product to others that may have resulted in damages. As such, the government is not entitled to summary judgment with respect to the plaintiff's claim in Count II that the government breached the covenant of good faith and fair dealing by bad-mouthing the plaintiff.

### III. CONCLUSION

For the forgoing reasons, the government's motion to dismiss is **DENIED.** The government's motion for summary judgment is **GRANTED–IN–PART** and **DENIED–IN–PART.** The parties shall file a joint status report by December 17, 2010 setting forth a schedule for resolving the remaining issues in dispute, including the government's counterclaim. This status report shall include proposed dates for completing discovery and for meeting with an ADR judge from the Court of Federal Claims to explore the possibility of settling both the plaintiff's and government's claims.

**IT IS SO ORDERED.**