# In the United States Court of Federal Claims

No. 11-148 C

(Filed:  August 27, 2013)

_____

)
VLADIMIR KOGAN, MD,                        )
                                            )
                       Plaintiff,           )      Cross-Motions for Summary
                                            )      Judgment; Contract Interpretation;
v.                                          )      Breach of Contract; Implied Duty
                                            )      of Good Faith and Fair Dealing
THE UNITED STATES OF AMERICA,               )
                                            )
                       Defendant.           )
_____ )

Vladimir Kogan, MD, Minnetonka, MN, pro se.[1]

Delisa Maria Sanchez, Trial Attorney, with whom were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Steven J. Gillingham, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.  Jason F. Rudie, Staff Attorney, United States Department of Veterans Affairs, Minneapolis, MN, of counsel.

## OPINION

HEWITT, Chief Judge

Dr. Vladimir Kogan (Dr. Kogan or plaintiff) is a Russian-born staff physician at the Minneapolis Veterans Affairs Healthcare System (the MVAHS), where he has worked for nearly thirty years.  See Compl., Docket Number (Dkt. No.) 1, ¶¶ 3, 7, 10.  In early 2001, plaintiff filed an Equal Employment Opportunity (EEO) claim against the

---

[1] On June 7, 2011 the court granted Dr. Vladimir Kogan's (Dr. Kogan or plaintiff) Motion to Allow Mrs. Valentina Kogan, My Wife, to Assist Me in this Case.  See Order of June 7, 2011, Docket Number (Dkt. No.) 8, at 1-2.  The court found that because Mrs. Valentina Kogan is plaintiff's wife, she meets the requirements of Rule 83.1(a)(3) of the Rules of the United States Court of Federal Claims (RCFC), id. at 1-2, which provides that "[a]n individual who is not an attorney may represent oneself or a member of one's immediate family . . . in any proceeding before this court," RCFC 83.1(a)(3).

1

United States Department of Veterans Affairs (the VA or defendant), acting through the Minneapolis Veterans Affairs Medical Center (the MVAMC),[2] alleging age and national origin discrimination. See id. ¶ 10. Plaintiff and the VA resolved the EEO action by entering into a settlement agreement dated April 29, 2002 (the Settlement Agreement), see id. ¶ 14, which, according to plaintiff, required the VA "to pay [Dr. Kogan] 100% salary for a full time physician in the Radiation Oncology Department," id. ¶ 27. Plaintiff alleges that, from January of 2006 to the present, the VA has breached the Settlement Agreement by failing to pay him an annual "effective salary for a physician in the Radiation Oncology Department" (count one). Id. ¶ 23 (internal quotation marks omitted); see id. ¶ 27 (similar). Plaintiff also alleges that the VA has breached an implied duty of good faith and fair dealing inherent in the Settlement Agreement (count two). See id. ¶¶ 30-31.

Before the court are: the Complaint, filed March 7, 2011; Plaintiff's Cross-Motion for Summary Judgment (plaintiff's Motion or Pl.'s Mot.), Dkt. No. 38, a Memorandum of Law in Support of Plaintiff's Cross-Motion for Summary Judgment (Pl.'s Mem.), Dkt. No. 39, and Exhibits to Memorandum of Law in Support of Plaintiff's Cross-Motion for Summary Judgment (Pl.'s Ex.),[3] Dkt. No. 39-1, filed February 19, 2013; Defendant's Cross-Motion for Summary Judgment (Def.'s Mot. or defendant's Motion), Dkt. No. 40, and an Appendix to Defendant's Cross-Motion for Summary Judgment (Def.'s App.),[4] Dkt. No. 40-1, filed February 19, 2013; Plaintiff's Response to Defendant's Cross-Motion for Summary Judgment (Pl.'s Resp.), Dkt. No. 46, filed April 15, 2013; Defendant's Response in Opposition to Plaintiff's Cross-Motion for Summary Judgment

---

[2] The Minneapolis Veterans Affairs Healthcare System (the MVAHS) was formerly known as the Minneapolis Veterans Affairs Medical Center (the MVAMC). Mem. of Law in Supp. of Pl.'s Cross-Mot. for Summ. J. (Pl.'s Mem.), Dkt. No. 39, at 1; Def.'s Cross-Mot. for Summ. J. (Def.'s Mot.), Dkt. No. 40, at 1 n.1; cf. Compl., Dkt. No. 1, ¶ 3 (referring to the "Minneapolis Veterans Administration Medical Center"). The court understands that the name change occurred sometime after April 29, 2002, when the parties signed a settlement agreement (Settlement Agreement), cf. Def.'s App. A4 (Settlement Agreement) (referring to the MVAMC), and the parties appear to use MVAHS and MVAMC interchangeably in their briefing without regard to the timing of events. When discussing events that occurred on or before April 29, 2002, the court refers to Dr. Kogan's place of employment as the MVAMC and when discussing events that occurred after the parties signed the Settlement Agreement, the court refers to Dr. Kogan's place of employment as the MVAHS.

[3] When citing to the Exhibits to [the] Memorandum of Law in Support of Plaintiff's Cross-Motion for Summary Judgment (Pl.'s Ex.), Dkt. No. 39-1, the court refers to the page number(s) assigned by the court's electronic filing system, which appear in the top right corner of each page.

[4] When citing to the Appendix to Defendant's Cross-Motion for Summary Judgment (Def.'s App.), Dkt. No. 40-1, the court refers to the page number(s) assigned by defendant.

2

(defendant's Response or Def.'s Resp.), Dkt. No. 47, and an Appendix to Defendant's Response in Opposition to Plaintiff's Cross-Motion for Summary Judgment (Def.'s Resp. App.),[5] Dkt. No. 47-1, filed April 19, 2013; Plaintiff's Reply to the []Defenda[n]t's Response in Opposition to P[la]intiff's Cross-Motion for Summary Judgment (Pl.'s Reply), Dkt. No. 48, filed May 15, 2013; and Defendant's Reply to Plaintiff's Response to Defendant's Cross-Motion for Summary Judgment (Def.'s Reply), Dkt. No. 49, filed May 15, 2013.

Plaintiff moves for summary judgment on count one and count two. See Pl.'s Mot. 1. Defendant cross-moves for summary judgment, contending that the VA did not breach the Settlement Agreement. See Def.'s Mot. 11. In its Response, defendant further argues that plaintiff has shown neither that the VA breached the implied duty of good faith and fair dealing nor that the VA acted in bad faith. Def.'s Resp. 11.

For the reasons stated below, plaintiff's Motion is DENIED, and defendant's Motion is DENIED-IN-PART. To the extent that defendant seeks dismissal of plaintiff's claims for punitive damages and for adjustment of plaintiff's future pension, defendant's Motion is GRANTED-IN-PART.

I.      Background[6]

A.      Plaintiff's Employment and Salary History from 1985 to 2000

Plaintiff was born and raised in St. Petersburg, Russia, where he earned MD and PhD degrees in radiation oncology. Pl.'s Mem. 3; Def.'s Mot. 2. Plaintiff practiced radiation oncology in St. Petersburg from 1968 to 1978. Pl.'s Mem. 3; Def.'s Mot. 2. In 1979, he immigrated to the United States, arriving in New York City. Pl.'s Mem. 3; Def.'s Mot. 2. In 1981, plaintiff passed the United States Medical Licensing Examination, a requirement for foreign-trained physicians to practice in the United States, and thereafter began a residency program in radiation oncology at Montefiore Medical Center in New York. Def.'s Mot. 2; see Pl.'s Mem. 3-4. Plaintiff completed his residency program in 1984 and a fellowship in radiation oncology in June of 1985. Pl.'s Mem. 4; Def.'s Mot. 2. In July of 1985, plaintiff began working at the MVAMC, where he served as a staff physician in the Radiation Oncology Department until 2000. See Pl.'s Mem. 4; Def.'s Mot. 2.

From 1985 to 2000, salaries for VA physicians consisted primarily of two

---

[5] When citing to the Appendix to Defendant's Response in Opposition to Plaintiff's Cross-Motion for Summary Judgment, Dkt. No. 47-1, the court refers to the page number(s) assigned by defendant.

[6] Unless otherwise noted, facts relied on in this Opinion and cited to the filings of only one of the parties do not appear to be in dispute.

components: base pay and special pay.[7] Def.'s Mot. 2; see Pl.'s Mem. 4. "Base pay was set according to a scale applicable to physicians and based primarily on the number of years of service with the []VA or Government service." Def.'s Mot. 2; see Pl.'s Mem. 4 (defining "basic pay" as a "fixed rate of pay that depend[s] on longevity (tenure)"). "Special pay was composed of various categories including: full-time status, tenure, board certification, geographic location, . . . and Scarce Specialty Pay." Def.'s Mot. 2-3. Physicians were eligible for Scarce Specialty pay, which "could not exceed $40,000 annually," if they practiced specialties considered "scarce by the []VA." Id. at 3 (emphasis omitted). If a physician was approved to receive scarce specialty pay, but "did not actually work full-time in his/her specialty for which he was receiving Scarce Specialty pay, then that physician's Scarce Specialty pay had to be reduced and pro-rated in accordance to the percentage of time worked in the scarce specialty." Id.; see Pl.'s Reply 32 (stating that the VA could prorate the special pay component if the physician "spen[t] a significant amount of time away from clinical duties within his/her specialty or assignment" (internal quotation marks omitted)). Radiation oncology was considered a "scarce specialty," and, from 1985 to 2000, plaintiff's salary included the maximum amount of scarce specialty pay--$40,000. See Pl.'s Mem. 4 (emphasis omitted); Def.'s Mot. 3.

### B. The Settlement Agreement

In February of 2000, the MVAMC placed plaintiff on administrative leave pending an investigation of certain medical practices within the Radiology Oncology Department. See Pl.'s Mem. 5; Def.'s Mot. 3. In April of 2001, the MVAMC took plaintiff off administrative leave and assigned him to work in Compensation & Pension (C&P) Services. Pl.'s Mem. 6; Def.'s Mot. 3. Plaintiff did not receive scarce specialty pay while placed on administrative leave, Def.'s Mot. 3; see Pl.'s Resp. 4 (claiming that, while Dr. Kogan was on administrative leave, the VA "stopped paying him his Scarce Specialty pay," among other alleged injuries), or while working in C&P Services, see Pl.'s Resp. 30 (claiming that the VA's failure to pay Dr. Kogan scarce specialty pay "from the time when he was transferred to the C&P and up to the execution of the Settlement Agreement was unlawful" (internal quotation marks omitted)); Def.'s Mot. 12 ("At the time the Settlement Agreement was executed, Dr. Kogan was not receiving the scarce specialty pay in the amount of $40,000.00 because he had been transferred to C&P . . . .").

In February of 2001, plaintiff filed an EEO claim against the VA, alleging "Age/62 and National Origin/Russia Discrimination and Retaliation." Pl.'s Mem. 1; see Def.'s Mot. 3. In early 2002, plaintiff's EEO claim was heard before an administrative

---

[7] This pay structure included provisions for cost of living adjustments and tenure increases. Pl.'s Mem. 4; cf. Def.'s Mot. 3 (noting that plaintiff's salary from 1985 to 2000 included a tenure component).

4

law judge.  See Pl.'s Mem. 7; Def.'s Mot. 4.  In March of 2002, the parties began settlement discussions.  Pl.'s Reply 29.  On April 29, 2002, plaintiff and the VA-- represented by then Director of the MVAMC, Steven P. Kleinglass (Mr. Kleinglass)-- entered into the Settlement Agreement, see Pl.'s Mem. 8; Def.'s Mot. 4.  See generally Def.'s App. A1-4 (Settlement Agreement).  The Settlement Agreement was signed by both Dr. Kogan and Mr. Kleinglass.  Pl.'s Mem. 1; Def.'s App. A4 (Settlement Agreement).

Under the terms of the Settlement Agreement, plaintiff agreed to withdraw his EEO claim.  See Def.'s App. A1 (Settlement Agreement).  In return, the VA agreed to "[r]estore Dr. Kogan's full privileges in its Radiation Oncology Department and retain existing full privileges in [C&P] Services."  Id. at A2.  The Settlement Agreement further provided that plaintiff would work four days a week in C&P Services and one day a week in Radiation Oncology.  Id.  Paragraph 3.E of the Settlement Agreement, which is the primary subject of dispute in this case, provided that the VA agreed to:

> Pay Dr. Kogan One Hundred Seventy-Four Thousand Three Hundred Fifty Seven Dollars ($174,357.00) per year, which is the effective salary for a physician in the Radiation Oncology Department immediately upon signing of the Settlement Agreement.  The $174,357.00 includes specialty pay in the amount of $40,000.00.

Id.

As provided in the Settlement Agreement, plaintiff began working four days a week in C&P Services and one day a week in Radiology Oncology, and the VA paid plaintiff an annual salary of $174,357.  See Pl.'s Mem. 9; Def.'s Mot. 4.  Plaintiff also "received annual cost-of-living adjustments . . . to his Annual Basic Pay as well as tenure increases to his special pay computation based on his years of []VA service."  Def.'s Mot. 4; see Pl.'s Mem. 28 (showing annual pay increases).  By January of 2006, plaintiff was earning an annual salary of $187,957.  Pl.'s Mem. 28; Def.'s App. A122 (tbl. entitled "Summary of How Dr. Kogan's Salary Changed from April 2002 To October 30, 2011" (plaintiff's salary history)).

C.     The Department of Veterans Affairs Health Care Personnel Enhancement Act of 2004 and Its Application to Plaintiff's Salary

In 2004 Congress enacted the Department of Veterans Affairs Health Care Personnel Enhancement Act of 2004 (the Act), Pub. L. No. 108-445, 118 Stat. 2636, which changed the method for calculating salaries for physicians employed by the VA, § 3(b), 118 Stat. at 2636-40 (codified as amended at 38 U.S.C. § 7431 (2006)) (establishing the pay structure for VA physicians).  The Act eliminated all provisions of physician special pay and provided that a physician's salary would consist of base pay, performance

5

pay and market pay.[8]  See 38 U.S.C. § 7431(a) (establishing the components of a VA physician's salary).  But see 38 U.S.C. § 7409 (providing that the Secretary of Veterans Affairs (the Secretary) may contract with certain "institutions and persons . . . to provide scarce medical specialist services").

Under the Act, base pay is "based on the total number of the years of the service of the physician . . . in the [VA]," id. § 7431(b)(3), and performance pay is based on a "physician's . . . achievement of specific goals and performance objectives prescribed by the Secretary," id. § 7431(d)(2).  Market pay "consist[s] of pay intended to reflect the recruitment and retention needs for the specialty . . . of a particular physician . . . in a [VA] facility."  Id. § 7431(c)(2).  In making a physician's market pay determination, the Secretary must "consult two or more national surveys of pay for physicians . . . , whether prepared by private, public, or quasi-public entities in order to make a general assessment of the range of pays payable to physicians," id. § 7431(c)(4)(A), and "consult with and consider the recommendations of an appropriate panel or board composed of physicians [(Compensation Panel)]," id. § 7431(c)(4)(B)(i).

The Act also authorized the Secretary to prescribe "four tiers of minimum and maximum amounts for a specialty . . . and [to] prescribe for each tier a minimum amount and maximum amount that the Secretary determines appropriate for the professional responsibilities, professional achievements, and administrative duties of the physicians . . . within that tier."  Id. § 7431(e)(1)(B).  The VA Handbook 5007, Pay Administration (VA Handbook)--which was issued "[t]o implement provisions of the [Act] as it relates to pay for [VA] physicians" and which "contains mandatory procedures on pay administration," Def.'s App. A67 (VA Handbook)--provides definitions for the four tiers to which physicians could be assigned:  Tier 1 - staff; Tier 2 - supervisors and program managers, including service and section chiefs; Tier 3 - "Network-level program manager and/or Network-level supervisory responsibilities within the specialty;" and Tier 4 - national chief consultant, national chief officer, "or other assignment that meets the level of responsibility equivalent to that of a national level," id. at A68.

The Act was to be implemented effective the first pay period of 2006.[9]  §3(d)(1), 118 Stat. at 2641.  Pursuant to the Act, on January 3, 2006, a "Compensation Panel

---

[8]  Salaries for physicians employed by the United States Department of Veterans Affairs (VA) during this time period could also include cost of living adjustments and tenure increases. Pl.'s Mem. 10; see 38 U.S.C. § 7431(b)(5)(2006) (providing that cost of living adjustments would be "determined as a percentage of base pay only"); cf. Def.'s Mot. 7 (noting that plaintiff's post-2006 salary included cost of living adjustments and tenure increases).

[9]  However, "[t]he process of conversion to the new system did not occur on the first day of pay year 2006."  Def.'s Mot. 7 (citing Def.'s App. A111 (Decl. of Steven P. Kleinglass (Mr. Kleinglass)).  Instead, in late Spring of 2006, physicians received guidance regarding their "retroactive lump sum payment[s] of additional salary from January 8, 2006 to the date of the

6

assembled to determine [plaintiff's] initial annual pay." Pl.'s Resp. 11 (internal quotation marks omitted); cf. 38 U.S.C. § 7431(c)(4)(B)(i) (requiring the Secretary to "consult with and consider the recommendations of [a Compensation Panel]" regarding the market pay component of a VA physician's pay). See generally Def.'s App. A5-7 (2006 Compensation Panel action). In making plaintiff's salary determination, defendant contends that the Compensation Panel relied in part on pay tables from the VA Central Office titled "Final Approved Pay Ranges for Physicians and Dentists, Effective January 2006" (2006 pay tables). See Def.'s App. A31-32 (Oct. 2, 2007 letter from Mr. Kleinglass to Lillette Turner (Ms. Turner) (Oct. 2, 2007 letter)) (explaining how the VA reached plaintiff's salary determination); cf. Def.'s App. A9 (2006 pay tables).

The 2006 pay tables provided the tiers and ranges of pay available to physicians employed by the VA. See Def.'s Mot. 5 ("The initial pay tables that became effective in January 2006 disclosed to the Compensation Panel the various applicable tiers and pay ranges that would guide and limit physician pay pursuant to the new law."); Def.'s App. A9 (2006 pay tables); cf. 38 U.S.C. § 7431(e)(1)(B) (authorizing the Secretary to set maximums and minimums for physicians across four payment tiers). "Relevant here, Pay Table 4 set forth the pay ranges applicable to a physician with a radiation oncology specialty employed by the []VA," Def.'s Mot. 5, and is reproduced, in part, below:

| Pay Table 4 | Specialty/Assignment |
|---|---|
| Tier 1: $90,000 - 255,000 | Anesthesiology |
| | Cardio-Thoracic Surgery |
| Tier 2: $125,000 - 275,000 | Neurosurgery |
| | Orthopedic Surgery |
| Tier 3: $140,000 - 285,000 | Plastic Surgery |
| | Radiology |
| Tier 4: $150,000 - 295,000 | Vascular Surgery |

Def.'s App. A9 (2006 pay tables). But see Pl.'s Resp. 40-41 (disagreeing with defendant's claim that the Compensation Panel relied on Pay Table 4 to determine plaintiff's salary); infra Part I.D (addressing plaintiff's view of how the Compensation Panel determined plaintiff's salary)

Given plaintiff's status as a staff physician, see Compl. ¶ 7 (stating that from 1985 to the present, plaintiff has worked as a staff physician), the Compensation Panel recommended that plaintiff be assigned to Tier 1[10] and that plaintiff earn an annual salary

---

payment[s] . . . and [their] new revised salar[ies] going forward." Def.'s App. A111 (Decl. of Mr. Kleinglass).

[10] Plaintiff does not dispute his assignment to Tier 1. See Pl.'s Reply to the "Def.'s Resp. in Opp'n to Pl.'s Cross-Mot. for Summ. J.["] (Pl.'s Reply), Dkt. No. 48, at 41 ("Dr. Kogan

of $195,200, Def.'s App. A6 (2006 Compensation Panel action). Defendant contends that, as is required under the Act, see 38 U.S.C. § 7431(c)(5) (governing the determination of market pay), and the procedures set forth in the VA Handbook, see Def.'s App. A68 (VA Handbook) (describing factors for consideration in determining market pay), the Compensation Panel considered the appropriate factors in reaching this determination, including plaintiff's level of experience in his specialty; the need for plaintiff's specialty at the MVAHS; the health care labor market for plaintiff's specialty; any board certifications earned by plaintiff; and plaintiff's previous employment with the VA, see Def.'s App. A32-33 (Oct. 2, 2007 letter). Mr. Kleinglass, the MVAHS approving official in 2006, adopted the Compensation Panel's recommendation, although he ultimately reduced plaintiff's annual rate of pay by $145. Def.'s Mot. 6; cf. Def.'s App. A68 (VA Handbook) (referring to an "approving official"). Accordingly, in January of 2006 plaintiff's annual salary increased to $195,055. Def.'s App. A122 (plaintiff's salary history); see Def.'s Mot. 6 (stating that a salary of $195,055 was approved for plaintiff); cf. Compl. ¶ 18 (stating that plaintiff's salary was increased to $195,000 in 2006).

D.     The Salary Chart Provided by the MVAHS Human Resources Specialist

On July 23, 2007 plaintiff met with MVAHS human resources specialist Marion Johnson (Ms. Johnson) to discuss how the Compensation Panel had determined his salary. See Def.'s App. A14 (Aug. 17, 2007 letter from plaintiff to Ms. Turner (Aug. 17, 2007 letter)) (discussing this meeting). According to plaintiff, Ms. Johnson informed him that, since 2006, his salary had been prorated--that is, 4/5 or eighty percent of his salary had been based on his work in C&P Services[11] and 1/5 or twenty percent of his salary had been based on his work in the Radiation Oncology Department. See Pl.'s Mem. 13. At plaintiff's request, and in an attempt to explain how the Compensation Panel had calculated his salary, Ms. Johnson provided plaintiff with a chart titled "Initial Salary Considerations for Dr. Kogan" (salary chart). See Compl. ¶ 19; Def.'s Mot. 7. See

---

has never challenged his assignment as a Tier 1 radiation oncologist or requested a reconsideration of his tier." (internal quotation marks omitted)); cf. Def.'s App. A75 (VA Handbook) (providing that "employees may request reconsideration of a tier determination").

[11]   There appears to be a discrepancy as to whether 4/5 or eighty percent of plaintiff's salary was based on the effective salary of a physician working in Compensation and Pension (C&P) Services, see, e.g., Pl.'s Mem. 22; Pl.'s Resp. to Def.'s Cross-Mot. for Summ. J. (Pl.'s Resp.), Dkt. No. 46, at 13, or whether 4/5 or eighty percent of plaintiff's salary was based on the effective salary of a physician working in Internal Medicine/Sports Medicine, see, e.g., Pl.'s Mem. 15, 26. According to plaintiff, Compensation and Pension (C&P) Services is simply a department within the MVAHS, and "[t]here is [no] such medical specialty as C&P nor [is there a] C&P salary." Pl.'s Mem. 34. The court does not consider this discrepancy to be material to the court's resolution of the pending motions.

generally Def.'s App. A8 (salary chart). The salary chart provided by Ms. Johnson is approximated below:

| | C&P Salary | Radiation Oncology Salary | Final Salary Ranges |
|---|---|---|---|
| low range | $155,000 | $220,000 | |
| % time commitment | 80% | 20% | |
| Prorated salaries | $124,000 | $44,000 | $168,000 |
| | | | |
| high range | $155,000 | $356,000 | |
| % time commitment | 80% | 20% | |
| Prorated salaries | $124,000 | $71,200 | $195,200 |

Approved Initial Salary

| | | |
|---|---|---|
| Market Pay | $75,055 | |
| Base Pay | $120,000 | |
| | $195,055 | |

January 2007 Change

| | | |
|---|---|---|
| Market Pay | $75,055 | |
| Base Pay | $122,040 | |
| | $197,095 | |

July 8, 2007 Tenure Increase

| | | |
|---|---|---|
| Market Pay | $75,055 | |
| Base Pay | $125,091 | |
| | $200,146 | |

Def.'s App. A8 (salary chart).

Plaintiff contends that, upon reviewing the salary chart, he realized that the MVAHS had been breaching the Settlement Agreement since January 2006. Compl. ¶ 19. Specifically, plaintiff contends that the MVAHS breached the Settlement Agreement beginning in January 2006 by (1) not "paying him an effective salary for a physician in the Radiation Oncology Department" and (2) prorating his salary. Pl.'s Resp. 24 (internal quotation marks omitted); cf. Def.'s App. A2 (Settlement Agreement) (stating that the VA will pay plaintiff "$174,357.00[] per year, which is the effective salary for a physician in the Radiation Oncology Department immediately upon signing of the

9

Settlement Agreement"). That is, according to plaintiff, the Compensation Panel identified $356,000 as the effective salary for a physician in the Radiation Oncology Department, Pl.'s Resp. 46, but based only twenty percent of his salary on that amount, id. at 28; cf. id. at 15 (explaining that the Compensation Panel calculated plaintiff's salary ($195,200) by adding 4/5 of $155,000 ($124,000) to 1/5 of $356,000 ($71,200)).

E.     Procedural History

On August 17, 2007 plaintiff sent a letter to Ms. Turner, chief of policy and compliance at the VA's Office of Resolution Management, requesting compensatory damages resulting from the alleged breach of the Settlement Agreement by the VA. See Def.'s App. A13 (Aug. 17, 2007 letter). In the August 17, 2007 letter, plaintiff claimed that, beginning in 2006, the VA "stopped paying [plaintiff] 100% of the effective salary for a physician in the Radiation Oncology Department" in violation of the Settlement Agreement. Id. at A16 (internal quotation marks omitted). Instead, plaintiff explained that "only 1/5 of his salary was calculated with respect to the effective salary for a Radiation Oncologist and 4/5 [of his salary was] calculated based on the effective salary for [an] Internal Medicine physician." Id.; cf. supra note 11 (noting discrepancy between plaintiff's arguments as to whether eighty percent of his salary was based on the effective salary of an internal medicine/sports medicine physician or that of a physician working in C&P Services).

On September 12, 2007 Ms. Turner sent a letter to Mr. Kleinglass that "contained questions related to Dr. Vladimir Kogan's assertion that the [VA] has breached [the Settlement Agreement]." Def.'s App. A27 (Oct. 2, 2007 letter). Mr. Kleinglass responded with a letter dated October 2, 2007, see id., in which he claimed that the VA "[was] in full compliance with the [Settlement Agreement]," id. at A33. In the October 2, 2007 letter, Mr. Kleinglass explained that plaintiff had been "classified as a 'tier one' physician" and that, pursuant to the 2006 pay tables, the MVAHS "was required to assign [plaintiff] a salary somewhere between $90,000 and $255,000." Id. at A31; cf. Def.'s App. A9 (2006 pay tables) (setting a range of $90,000 to $225,000 for tier one physicians specializing in radiology). Mr. Kleinglass also explained that the Compensation Panel "followed the process set forth in [the] VA Handbook" and that "application of the 1/5 v. 4/5 tool" was among the many factors considered by the Compensation Panel in determining plaintiff's salary. Def.'s App. A32 (Oct. 2, 2007 letter). On October 19, 2007, based on the information provided by Mr. Kleinglass, the VA's Office of Resolution Management concluded that the VA "ha[d] fully complied with the provisions in the settlement agreement and [that] therefore no breach ha[d] occurred." See Def.'s App. A81 (Oct. 19, 2007 letter from Ms. Turner to Valentina Kogan).

On January 3, 2008 plaintiff filed a complaint alleging breach of the Settlement Agreement in the United States District Court for the District of Minnesota (the District Court). See Pl.'s Mem. 15-16; Def.'s Mot. 8. On April 23, 2009 the District Court dismissed plaintiff's complaint, holding that "[b]ecause the monetary relief sought by Dr.

10

Kogan in his breach of contract claim exceeds $10,000, jurisdiction over his claim lies exclusively with the [United States] Court of Federal Claims." Kogan v. Peake, No. 08-16 ADM/JJK, 2009 WL 1097915, at *5 (D. Minn. Apr. 23, 2009).

On March 7, 2011 plaintiff filed his Complaint in this court, alleging that the VA breached both the Settlement Agreement (count one) and the implied duty of good faith and fair dealing inherent in the Settlement Agreement (count two). See generally Compl. Plaintiff contends that there are two key issues: "Whether the terms of the Settlement Agreement require the MVAMC to pay Dr. Kogan an effective salary for a physician in the Radiation Oncology Department," and "[w]hether the terms of the Settlement Agreement require the MVAMC not to pro-rate Dr. Kogan's Salary."[12] Pl.'s Resp. 20 (internal quotation marks omitted). For each claim, plaintiff seeks "[d]amages in an amount of $765,000.00 (salary lost from January 2006 to January 2011) plus an amount to be determined at trial;" payment of a "100% effective salary for a full time physician in the Radiation Oncology Department equal to $356,000.00 plus an amount to be determined at trial;" and adjustment of his future pension. Compl., Prayer for Relief. Plaintiff also seeks costs of this suit, pre- and post-judgment interest and "[s]uch other relief as this Court may [find] proper." Id.

II.     Legal Standards

        A.      Jurisdiction

"[T]he United States may be sued only to the extent that it allows its sovereign immunity to be waived." United Electric Corp. v. United States, 227 Ct. Cl. 236, 240, 647 F.2d 1082, 1084 (1981). The Tucker Act, 28 U.S.C. § 1491 (2006), "serves as both a waiver of sovereign immunity and a jurisdictional grant for this court," Liberty Mut. Ins. Co. v. United States, 70 Fed. Cl. 37, 41 (2006). The Tucker Act provides that the United States Court of Federal Claims (Court of Federal Claims) has jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Although, with respect to the types of claims specified, the Tucker Act waives the sovereign immunity necessary for a plaintiff to sue the United States for money damages, United States v. Mitchell, 463 U.S. 206, 212 (1983), it does not confer any substantive rights upon a plaintiff, United States v. Testan, 424 U.S. 392, 398 (1976). A plaintiff must establish an independent substantive right to money damages from the United States--that is, a money-mandating source within a contract,

_____

[12]    Plaintiff also claims that "another critical issue in this case is . . . [w]hether the [Act] abrogated the April 29, 2002 Settlement Agreement between the []VA and Dr. Kogan." Pl.'s Resp. 22. The court addresses this issue in Part III.B.2.

11

regulation, statute or constitutional provision--in order for the case to proceed. See Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1306 (Fed. Cir. 2008).

B.     Cross-Motions for Summary Judgment

The parties have filed cross-motions for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC).[13] See Pl.'s Mem. 1; Def.'s Mot. 1. A motion for summary judgment may be granted only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). The moving party has the initial burden of establishing "the absence of any genuine issue of material fact and entitlement to judgment as a matter of law." Crater Corp. v. Lucent Techs., Inc., 255 F.3d 1361, 1366 (Fed. Cir. 2001). "The party opposing the motion must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient." SRI Int'l v. Matsushita Electric Corp. of Am., 775 F.2d 1107, 1116 (Fed. Cir. 1985) (en banc). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis omitted). A fact is material if it might affect the outcome of the suit, and a dispute over a material fact is genuine "if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." Id. at 248.

In considering a motion for summary judgment, the court draws all inferences in favor of the nonmoving party. See Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Mann v. United States, 334 F.3d 1048, 1050 (Fed. Cir. 2003). When considering cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1391 (Fed. Cir. 1987).

C.     Breach of Contract

"To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." San Carlos Irrigation & Drainage Dist. v. United States (San Carlos), 877 F.2d 957, 959 (Fed. Cir. 1989). The

---

[13] The Rules of the United States Court of Federal Claims generally mirror the Federal Rules of Civil Procedure (FRCP). See RCFC 56 rules committee note (2008 amendment) ("The language of RCFC 56 has been amended to conform to the general restyling of the FRCP."); C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1541 n.2 (Fed. Cir. 1993) ("The [RCFC] generally follow the [FRCP]. [RCFC] 56(c) is, in pertinent part, identical to [FRCP] 56(c)."). Accordingly, this court relies on cases interpreting FRCP 56 as well as those interpreting RCFC 56.

parties do not dispute that the Settlement Agreement is a valid contract, but they interpret differently the obligations or duties that arise out of the Settlement Agreement. Compare Pl.'s Mem. 23 (claiming the Settlement Agreement requires the VA to pay plaintiff "an effective salary for a physician in the Radiation Oncology Department, including required salary increases, for as long as Dr. Kogan is working at [the] MVAHS and [requires that] his salary must not be pro-rated" (internal quotation marks omitted)) with Def.'s Resp. 9 (claiming that the Settlement Agreement requires the VA to pay plaintiff "an annual salary of $174,357.00"). Determining the obligation or duty that arises out of a contract "is a legal question of contract interpretation," San Carlos, 877 F.2d at 959, and contract interpretation is "generally amenable to summary judgment," Varilease Tech. Grp., Inc. v. United States, 289 F.3d 795, 798 (Fed. Cir. 2002).

      D.     Contract Interpretation

"It has been a fundamental precept of common law that the intention of the parties to a contract control[s] its interpretation." Beta Sys., Inc. v. United States (Beta), 838 F.2d 1179, 1185 (Fed. Cir. 1988) (alteration and internal quotation marks omitted). "'That intention must, in the first instance, be derived from the language of the contract.'" Nicholson v. United States, 29 Fed. Cl. 180, 194 (1993) (quoting 4 Samuel Williston, A Treatise on the Law of Contracts § 601 (3d ed. 1961)). Therefore, when interpreting a contract, the court must first consider the plain language of the contract. See Aleman Food Servs., Inc. v. United States (Aleman), 994 F.2d 819, 822 (Fed. Cir. 1993); Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991). The plain language of the contract "must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." TEG-Paradigm Envtl., Inc. v. United States (TEG-Paradigm), 465 F.3d 1329, 1338 (Fed. Cir. 2006) (alteration in original) (internal quotation marks omitted).

The plain language of the contract will be viewed as controlling if it is unambiguous on its face. Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1040-41 (Fed. Cir. 2003) (en banc); see TEG-Paradigm, 465 F.3d at 1338 ("When the contract's language is unambiguous it must be given its plain and ordinary meaning and the court may not look to extrinsic evidence to interpret its provisions." (internal quotation marks omitted)). Accordingly, the court may not introduce extrinsic evidence "to create an ambiguity where the language is clear." City of Tacoma, Dep't of Pub. Utils. v. United States, 31 F.3d 1130, 1134 (Fed. Cir. 1994); see Beta, 838 F.2d at 1183 ("The general rule is that extrinsic evidence will not be received to change the terms of a contract that is clear on its face.").[14]

---

[14] This contract interpretation approach, which is endorsed by the United States Court of Appeals for the Federal Circuit (Federal Circuit), "is contrary to the majority Restatement (Second) [of Contracts] approach, which allows extrinsic evidence of the parties' intent regardless of the common or plain meaning of contractual terms." Travelers Cas. & Sur. Co. of

A contract is ambiguous if it is "susceptible to more than one reasonable meaning." Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375-76 (2004). Although the parties' differing interpretations of contract terms do not necessarily create an ambiguity, Cmty. Heating & Plumbing Co. v. Kelso, 987 F.2d 1575, 1578 (Fed. Cir. 1993), a contract will be considered ambiguous if "it sustains the interpretations advanced by both parties to the suit," Pacificorp Capital, Inc. v. United States, 25 Cl. Ct. 707, 716 (1992), aff'd per curiam, 988 F.2d 130 (Fed. Cir. 1993) (unpublished table disposition).

If a contract is ambiguous, the court may rely on extrinsic evidence to discern the parties' intent. Tecom, Inc. v. United States, 66 Fed. Cl. 736, 743 (2005); see Metro. Area Transit, Inc. v. United States (Metro.), 463 F.3d 1256, 1260 (Fed. Cir. 2006) ("Having found the contract ambiguous, we may appropriately look to extrinsic evidence to aid in our interpretation of the contract."). Extrinsic evidence may include prior negotiations between the parties, see Sylvania Electric Prods., Inc. v. United States (Sylvania), 198 Ct. Cl. 106, 126, 458 F.2d 994, 1005 (1972) ("Expressions of the parties during negotiations for the contract are . . . a frequent source for interpretation of its text."), as well as the parties' subsequent course of performance under the contract, Metro., 463 F.3d at 1260; see Max Drill, Inc. v. United States, 192 Ct. Cl. 608, 620, 427 F.2d 1233, 1240 (1970) (en banc) (per curiam) ("The interpretation of a contract by the parties to it before the contract becomes the subject of controversy is deemed by the courts to be of great, if not controlling weight.").

However, if the court must weigh extrinsic evidence of the parties' intent to interpret an ambiguous contract, "the matter is not amenable to summary resolution." See Beta, 838 F.2d at 1183 ("To the extent that the contract terms are ambiguous, requiring weighing of external evidence, the matter is not amenable to summary resolution."); Tecom, Inc., 66 Fed. Cl. at 743 (stating that when a contract is "ambiguous, necessitating a review of extrinsic evidence to determine the parties' intent," summary judgment is not appropriate "if material facts are genuinely in dispute").

E.    The Implied Duty of Good Faith and Fair Dealing

Government contracts, like all other contracts, include an implied duty of good faith and fair dealing, which requires that each party not interfere with the other party's rights under the contract. Precision Pine & Timber, Inc. v. United States (Precision Pine), 596 F.3d 817, 828 (Fed. Cir. 2010); Centex Corp. v. United States (Centex), 395 F.3d 1283, 1304 (Fed. Cir. 2005). Each party has the duty "'to do everything that the

_____

Am. v. United States, 75 Fed. Cl. 696, 709 (2007); cf. Carter v. United States, 102 Fed. Cl. 61, 69 n.7 (2011) ("[T]he Federal Circuit is one of the less receptive circuits with respect to the use of extrinsic evidence to elucidate an otherwise plain contract.").

14

contract presupposes should be done by a party to accomplish the contract's purpose.'" Stockton E. Water Dist. v. United States, 583 F.3d 1344, 1365 (Fed. Cir. 2009) (quoting 30 Richard A. Lord, Williston on Contracts § 77.10 (4th ed. 1999)), partial reh'g granted on other grounds, 638 F.3d 281 (Fed. Cir. 2011). Because this implied duty protects contractual rights, exactly what it "entails depends in part on what [a given] contract promises." Precision Pine, 596 F.3d at 830. Significantly, a party's contractual obligations are not expanded by the implied duty of good faith and fair dealing. Id. at 831; see Bradley v. Chiron Corp., 136 F.3d 1317, 1326 (Fed. Cir. 1998) (citing Racine & Laramie, Ltd. v. Cal. Dep't of Parks & Recreation, 14 Cal. Rptr. 2d 335, 339 (Cal. Ct. App. 1992) for the proposition that "implied covenants of good faith and fair dealing are limited to assuring compliance with the express terms of the contract and [cannot] be extended to create obligations not contemplated in the contract").

To support a claim for breach of the implied duty of good faith and fair dealing with respect to a government contract, a plaintiff must show that the government acted in a way "specifically designed to reappropriate the benefits the other party expected to obtain from the [contract], thereby abrogating the government's obligations under the contract." Precision Pine, 596 F.3d at 829; see Centex, 395 F.3d at 1311 (similar). In other words, a party must not "act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." Centex, 395 F.3d at 1304. Moreover, "proof of 'bad faith' is not required to show a breach of the implied duty of good faith and fair dealing." TigerSwan, Inc. v. United States, 110 Fed. Cl. 336, 346 (2013) (citing, inter alia, D'Andrea Bros. LLC v. United States, 96 Fed. Cl. 205, 222 n.24 (2010)); see Westlands Water Dist. v. United States, 109 Fed. Cl. 177, 204 (2013) (stating that "[a] showing of bad faith is not an element of [a claim for breach of the implied duty of good faith and fair dealing]"); Rivera Agredano v. United States, 70 Fed. Cl. 564, 574 n.8 (2006) (similar).

### F. The Presumption of Good Faith Conduct by Government Officials

A party alleging that the government has acted in bad faith must overcome the presumption that government officials discharge their duties in good faith. Road & Highway Builders, LLC v. United States (Road & Highway), 702 F.3d 1365, 1368 (Fed. Cir. 2012). The presumption of good faith "is valid and binding unless well-nigh irrefragable proof is offered to rebut or overcome it." McEachern v. Office of Pers. Mgmt., 776 F.2d 1539, 1545 (Fed. Cir. 1985) (internal quotation marks omitted); see Galen Med. Assocs., Inc. v. United States (Galen), 369 F.3d 1324, 1330 (Fed. Cir. 2004) (stating that when a party "alleges bad faith, in order to overcome the presumption of good faith on behalf of the government, the proof must be almost irrefragable" (alterations and internal quotation marks omitted)). In Am-Pro Protective Agency v. United States, 281 F.3d 1234 (Fed. Cir. 2002), the Federal Circuit equated "well-nigh irrefragable proof" with "clear and convincing evidence," id. at 1239-40 (internal quotation marks omitted); see Road & Highway, 702 F.3d at 1368 ("[I]t is 'well-established . . . that a high burden must be carried to overcome this presumption,'

15

amounting to clear and convincing evidence to the contrary." (omission in original)). "[T]he necessary irrefragable proof has [also] been equated with evidence of some specific intent to injure the plaintiff." Galen, 369 F.3d at 1330 (internal quotation marks omitted); see Road & Highway, 702 F.3d at 1369 ("[A] challenger seeking to prove that a government official acted in bad faith in the discharge of his or her duties must show a specific intent to injure the plaintiff by clear and convincing evidence." (internal quotation marks omitted)).[15]

III. Discussion

A. Jurisdiction

The Settlement Agreement includes a money-mandating provision that requires the VA to pay plaintiff "One Hundred Seventy-Four Thousand Three Hundred Fifty Seven Dollars ($174,357.00) per year, which is the effective salary for a physician in the

_____

[15] Plaintiff contends that the United States Court of Federal Claims has, at times, applied the "'preponderance of the evidence'" standard when determining whether the government acted in bad faith. See Pl.'s Reply 48-49 (citing Harrington v. United States, 161 Ct. Cl. 432, 441-42 (1963) (per curiam)). Plaintiff argues, in the alternative, that a party could meet the "'well-nigh irrefragable proof'" standard "by showing a lack of evidence to support an official's decision." Id. at 49 (citing Crocker v. United States, 130 Ct. Cl. 567, 574-75, 127 F. Supp. 568, 572 (1995); Marcus v. United States, 200 Ct. Cl. 544, 552, 473 F.2d 896, 900 (1973) (en banc); Kozak v. United States, 198 Ct. Cl. 31, 35-37, 458 F.2d 39, 40-42 (1972) (en banc)).

Indeed, some opinions of our predecessor court, the Court of Claims, "stated that a 'preponderance of the evidence' standard applied in determining whether government actions were . . . in bad faith." Tecom, Inc. v. United States, 66 Fed. Cl. 736, 768 (2005) (citing, inter alia, Harrington, 161 Ct. Cl. at 441-442). "And while 'well-nigh irrefragable proof' was often stated as the standard, it could still be met by showing a lack of evidence to support an official's decision." Id. (citing Crocker, 130 Ct. Cl. at 574-75, 127 F. Supp. at 572; Marcus, 200 Ct. Cl. at 552, 473 F.2d at 900; Kozak, 198 Ct. Cl. at 35-37, 458 F.2d at 40-42). However, the Federal Circuit has applied the "clear and convincing" standard to the presumption of good faith since its decision in Am-Pro Protective Agency v. United States (Am-Pro), 281 F.3d 1234 (Fed. Cir. 2002). Road & Highway Builders, LLC v. United States (Road & Highway), 702 F.3d 1365, 1369 (Fed. Cir. 2012); see Rodriguez v. United States, 69 Fed. Cl. 487, 499 (2006) (stating that the Federal Circuit ultimately "equated 'well-nigh irrefragable proof' with the traditional clear and convincing standard of proof, and held that the latter legal standard 'most appropriately describes the burden of proof applicable to the presumption of the government[']s good faith'" (alteration in original) (footnote omitted) (quoting Am-Pro, 281 F.3d at 1239)). Moreover, the Federal Circuit has recently confirmed that a party "seeking to prove that a government official acted in bad faith in the discharge of his or her duties must show a specific intent to injure the plaintiff," Road & Highway, 702 F.3d at 1369 (internal quotation marks omitted), rather than merely "showing a lack of evidence to support [the government] official's decision," cf. Tecom, Inc., 66 Fed. Cl. at 768 (describing the standard formerly applied).

Radiation Oncology Department immediately upon signing of the Settlement Agreement." Def.'s App. A2 (Settlement Agreement). Accordingly, the court finds that the Settlement Agreement is a money-mandating source of the type required for Tucker Act jurisdiction and that the court has jurisdiction over plaintiff's claims of breach of contract and breach of the implied duty of good faith and fair dealing. Cf. Fisher v. United States, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc in relevant part) ("[I]n order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages."). However, for the reasons provided below, the court lacks jurisdiction to determine plaintiff's future pension and to award plaintiff punitive damages.

1. The Court Does Not Have Jurisdiction to Determine Plaintiff's Future Pension

Defendant argues that this court lacks "jurisdiction to adjudicate claims relating to Federal employee retirement benefits," Def.'s Resp. 27, and that, to the extent plaintiff requests that the court determine the amount of his future pension, the court should dismiss any such claim, id. at 26-27; cf. Compl. 10 (requesting, with respect to counts one and two, that the court "determine the amount of [his] future pension based on the effective salary for a physician in the Radiation Oncology Department").

Plaintiff's future pension falls under the Federal Employees' Retirement System (FERS). Pl.'s Reply 49; see Federal Employees' Retirement System Act of 1986, Pub. L. No. 99-335, 100 Stat. 514 (codified as amended at 5 U.S.C. §§ 8401-8480 (2006)). FERS is administered by the Office of Personnel Management (OPM), see 5 U.S.C. § 8461(b), which is also responsible for "adjudicat[ing] all claims" arising under FERS, id. § 8461(c); Agee v. United States, 77 Fed. Cl. 84, 92 (2007) ("Congress entrusted the OPM with administering . . . FERS, and to adjudicate all claims arising under [this] retirement system[]."). Therefore, to the extent that plaintiff seeks revisions to his "future pension," see Compl. 10, plaintiff's only source of recourse is with OPM, cf. Agee, 77 Fed. Cl. at 92 (stating that "this Court is barred from adjudicating . . . retirement related claims" and advising the plaintiffs to, therefore, "seek review and revision of their [retirement] benefits with OPM"). Accordingly, plaintiff's request is dismissed for lack of subject matter jurisdiction.

2. The Court Does Not Have Jurisdiction to Award Punitive Damages

Defendant also argues that this court lacks jurisdiction to award punitive damages and that, to the extent that plaintiff requests that the court award him punitive damages, the court should dismiss such a claim. Def.'s Resp. 28; cf. Pl.'s Mem. 45 (claiming that the "[t]otal amount of Dr. Kogan's money damages" includes "[p]unitive damages as this Court may f[i]nd proper"). It is well-established that this court does not have jurisdiction to award punitive damages. Mastrolia v. United States, 91 Fed. Cl. 369, 382 (2010); see,

e.g., Meschkow v. United States, 109 Fed. Cl. 637, 645 (2013); Envtl. Safety Consultants, Inc. v. United States, 95 Fed. Cl. 77, 98 (2010).  Therefore, to the extent that plaintiff requests that the court award him punitive damages, plaintiff's request is dismissed for lack of subject matter jurisdiction.

        B.        Count I:  Breach of Contract

        1.        Paragraph 3.E of the Settlement Agreement Supports the Interpretations Advanced by Both Parties and Is Therefore Ambiguous

The parties have competing interpretations of Paragraph 3.E of the Settlement Agreement, and each reads Paragraph 3.E as requiring different duties on the part of the VA.  Plaintiff contends that Paragraph 3.E obligates the VA to pay him "an effective salary for a physician in the Radiation Oncology Department," see Pl.'s Resp. 27 (internal quotation marks omitted), and that Paragraph 3.E prohibits the VA from prorating his salary, Pl.'s Mem. 29.  In contrast, defendant contends that Paragraph 3.E obligates the VA to pay plaintiff an annual salary of $174,357.00 and does not prohibit the VA from prorating plaintiff's salary.  Def.'s Resp. 9-10.  Each party further argues that Paragraph 3.E is clear and unambiguous and that its respective interpretation is supported by the plain language of the Settlement Agreement.  See Pl.'s Reply 24 ("The language of [Paragraph 3.E of the Settlement Agreement] is not ambiguous and [is] clear."); Def.'s Reply 4 ("The plain language of Paragraph 3.E is clear and unambiguous[.]" (emphasis and some capitalization omitted)).  But see Pl.'s Mem. 23 ("If the Settlement Agreement contains an ambiguity it will be appropriate for the Court to rule in Dr. Kogan's Favor." (emphasis omitted)); id. at 24 ("This Court will interpret the Settlement Agreement and may detect an ambiguity in provision 3.E.").

As plaintiff correctly states, "The purpose of interpreting a contract is, of course, to 'accomplish the intentions of the parties.'"  Pl.'s Mem. 25 (quoting In re Binghamton Bridge, 70 U.S. 51, 74 (1865)); see also Beta, 838 F.2d at 1185 ("It has been a fundamental precept of common law that the intention of the parties to a contract control[s] its interpretation." (alteration and internal quotation marks omitted)).  In order to discern the intent of the parties, the court must first look to the plain language of the Settlement Agreement.  Cf. Aleman, 994 F.2d at 822 (stating that "courts should look to the plain language of the contract to resolve any questions of contract interpretation"); Nicholson, 29 Fed. Cl. at 194 (stating that the parties' "intention must, in the first instance, be derived from the language of the contract" (internal quotation marks omitted)).  In doing so, the court must give the language of the Settlement Agreement "that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances."  Cf. TEG-Paradigm, 465 F.3d at 1338 (internal quotation marks omitted).

18

The Settlement Agreement provides that its purpose is to "resolve [plaintiff's] allegation of Age/62 and National Origin/Russian discrimination and Retaliation" against the VA. Def.'s App. A1 (Settlement Agreement). In exchange for plaintiff's agreeing to "[w]ithdraw the formal complaints of discrimination . . . and his request for a hearing before the EEOC," see id. at A1-2, the VA agreed to several performance obligations, see id. at A2-3. The obligation in dispute here is found in Paragraph 3.E of the Settlement Agreement, which provides that the VA agrees to:

> Pay Dr. Kogan One Hundred Seventy-Four Thousand Three Hundred Fifty Seven Dollars ($174,357.00) per year, which is the effective salary for a physician in the Radiation Oncology Department immediately upon signing of the Settlement Agreement. The $174,357.00 includes specialty pay in the amount of $40,000.00.

Id. at A4.

In the court's view, the plain language of the Settlement Agreement "is susceptible of two different and reasonable interpretations, each of which is . . . consistent with the contract language." Cf. Cmty. Heating & Plumbing Co., 987 F.2d at 1579. Plaintiff interprets Paragraph 3.E as obligating the VA to pay him "an effective salary for a physician in the Radiation Oncology Department, including all salary increases, for as long as Dr. Kogan is working at the MVAMC." Pl.'s Resp. 27 (internal quotation marks omitted); see id. at 30 ("The intent of the provision 3.E[] of the Settlement Agreement was to establish the basis upon which Dr. Kogan's effective salary for a physician in the Radiation Oncology Department, that in 2002 was $174,357.00, would be increased in the future." (internal quotation marks omitted)). Defendant interprets Paragraph 3.E as obligating the VA to pay plaintiff an annual salary of "$174,357.00 per year going forward." Def.'s Resp. 18; see Def.'s Mot. 13 ("The Settlement Agreement is unequivocal that Dr. Kogan's salary was to be $174,357.00 after the execution of the [settlement] agreement."); Def.'s Reply 9 (arguing that the phrase "'the effective salary for a physician in the radiation oncology department' . . . merely describes what the amount of $174,357.00 then represented in connection with the agreement"). In summary, plaintiff reads Paragraph 3.E as obligating the VA to pay plaintiff an annual salary of a physician in the Radiation Oncology Department from time to time ($174, 357 at the time of the Settlement Agreement), and defendant reads Paragraph 3.E as obligating the VA to pay plaintiff an annual salary of $174,357 for as long as he works at the MVAHS. The court considers the readings of both parties reasonable because neither the plain language of Paragraph 3.E nor the remainder of the Settlement Agreement clearly establishes for what period of time the VA obligated itself to pay plaintiff an annual salary of $174,375. See Def.'s App. A1-4 (Settlement Agreement).

The court also finds that it is unclear whether the Settlement Agreement allowed plaintiff's salary to be prorated. The Settlement Agreement states, "The $174,357.00

19

includes specialty pay in the amount of $40,000.00." Id. at A2. Plaintiff suggests that this language prohibits the VA from ever prorating his salary. See Pl.'s Mem. 29 (claiming that "there is a requirement in the provision 3.E[] to avoid to pro-rate his salary" (emphasis omitted)); Pl.'s Reply 32 (claiming that "the requirement [] not to pro-rate Dr. Kogan's salary . . . was expressed by the []VA in the following language: 'The $174,357 includes specialty pay in the amount of $40,000'"). Defendant counters that the same language "ensure[d] that Dr. Kogan's pay was inclusive of $40,000 [of scarce specialty pay] per year irrespective of the fact that Dr. Kogan was not working full-time in Radiation Oncology," without resolving whether his salary might otherwise be prorated, see Def.'s Mot. 13; Def.'s Resp. 16 (arguing that the VA used "the term 'pro-rate' [to] refer[] to the preservation of the $40,000 in Dr. Kogan's total annual salary . . . not [as] an expression of an understanding that Dr. Kogan's salary would never be prorated in any manner or calculated using a formula"); cf. Def.'s App. A2 (Settlement Agreement) (providing that "Dr. Kogan will work one day per week in Radiation Oncology and four days per week in [C&P Services]"). The court finds that both parties' interpretations of this provision of Paragraph 3.E are reasonable because it is unclear from the plain language whether the provision was meant to prevent any future prorating of Dr. Kogan's salary or meant only to preserve the $40,000 of scarce specialty pay. See Def.'s App. A2 (Settlement Agreement).

Paragraph 3.E of the Settlement Agreement "sustains the interpretations advanced by both parties" and is therefore ambiguous. Cf. Pacificorp Capital, Inc., 25 Cl. Ct. at 716. Because the obligation or duty required of the VA under Paragraph 3.E is ambiguous the court cannot, at this stage of the proceedings, determine whether the VA breached that duty.[16] Cf. San Carlos, 877 F.2d at 959 ("To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach."). Accordingly, summary judgment as to the breach of contract portion of plaintiff's claim is precluded.

---

[16] The court also finds it premature to address whether, if the Settlement Agreement obligates the VA to pay plaintiff "the effective salary for a physician in the Radiation Oncology Department," see Def.'s App. A2 (Settlement Agreement), that salary, from January 2006 to the present, is $356,000, cf. Pl.'s Resp. 24 (claiming that the Compensation Panel selected $356,000 as the "salary for a Radiation Oncology physician"), 46 (claiming that the $356,000 figure is derived from American Association of Medical Colleges data, "mirrors" data from the Accreditation Counsel for Graduate Medical Education, and is consistent with the Compensation and Production Survey); Def.'s Resp. 19 (claiming that the VA "had no obligation or duty to pay Dr. Kogan a yearly salary in the amount of $356,000.00 after the implementation of the Department of Veterans Affairs Health Care Personnel Enhancement Act of 2004[, Pub. L. No. 108-445, 118 Stat. 2636]").

Further, although the court may generally look to extrinsic evidence to discern the parties' intent, cf. Tecom, Inc., 66 Fed. Cl. at 743 (stating that, if a contract is ambiguous, the court may rely on extrinsic evidence to discern the parties' intent), here, the parties raise genuine issues of material fact regarding the extrinsic evidence. [17] And, where contract interpretation "require[s] weighing of external evidence, the matter is not amenable to summary resolution." Beta, 838 F.2d at 1183; see Tecom, Inc., 66 Fed. Cl. at 743 (stating that where "material facts are genuinely in dispute," regarding extrinsic evidence of the parties' intent, "summary judgment may not be granted").

2.      Questions Remain Regarding the Act's Effect on the Settlement Agreement

As addressed above in Part I.C, the Act changed the method by which salaries for VA physicians would be calculated and eliminated scarce specialty pay. See supra Part I.C. It is undisputed that the passage of the Act was an intervening event that the parties did not foresee. See Def.'s App. A30 (Oct. 2, 2007 letter) ("Section 3E of the settlement [agreement] does not address future changes in the VA's physician pay system."), A33 ("The April 29, 2002 EEO settlement [agreement] failed to anticipate a change in federal law that eliminated special pay agreements.").

Plaintiff claims, simply, that the Act did "not abrogate the April 29, 2002 Settlement Agreement." Pl's Mem. 12; see id. at 32 (claiming that the Act "does not have a requirement to abrogate the Settlement[] Agreement" and "does not identify any conditions under which the Settlement Agreement[] must be canceled" (emphasis omitted)); Pl.'s Resp. 13 (similar). Plaintiff also argues that the VA prorated his salary in violation of both the Act and the VA Handbook. See Pl.'s Resp. 16; Pl.'s Reply 48; see

_____

[17] In support of his interpretation of Paragraph 3.E of the Settlement Agreement, plaintiff invokes the following extrinsic evidence: (1) a settlement proposal dated February 20, 2002 (Settlement Proposal), see Pl.'s Mem. 19-20; cf. Pl.'s Ex. 35-36 (Settlement Proposal); (2) declarations of Mr. Kleinglass and Marion Johnson (Ms. Johnson), Pl.'s Reply 32; cf. Pl.'s Ex. 41-51 (Decl. of Mr. Kleinglass), 52-61 (Decl. of Ms. Johnson); and (3) "[a]ctions taken by the MVAHS Administration after the Settlement Agreement was signed in April 2002 and before the breach of the Settlement Agreement occurred in January 2006,"--that is, plaintiff's salary history from April 2002 through January 2006, see Pl.'s Mem. 27-28; Pl.'s Resp. 29-30; cf. Def.'s App. A122 (plaintiff's salary history). Although plaintiff contends that he "does not seek to incorporate any extrinsic evidence, as all evidence already [is contained] in [Paragraph 3.E of the Settlement Agreement]," Pl.'s Reply 24; see id. at 36 ("All evidence presented by Dr. Kogan to the court are not extrinsic, as they confirm requirements, which are already contained in the body of the Settlement Agreement[.]" (capitalization omitted)), the evidence on which plaintiff relies is not found within the four corners of the Settlement Agreement and is therefore extrinsic, cf. supra Part II.D (stating that extrinsic evidence may include the parties' prior negotiations and subsequent course of performance).

21

also Pl.'s Mem. 30-32 (claiming that neither the Act nor the VA Handbook require the VA to prorate physicians' salaries).

Defendant does not directly address plaintiff's arguments. Instead, defendant argues only that the Compensation Panel complied with the Act and the VA Handbook in selecting plaintiff's salary. See Def.'s Mot. 14-16; Def.'s Reply 10-14; cf. supra note 16 (finding it premature to address whether, as defendant claims, the VA "had no obligation or duty to pay Dr. Kogan a yearly salary in the amount of $356,000.00 after the implementation of the [Act]").

The court requires further briefing on whether the change in law affected the Settlement Agreement. Specifically, the court seeks additional briefing from defendant as to whether, as plaintiff claims, the Act did "not abrogate the April 29, 2002 Settlement Agreement," see Pl.'s Mem. 12, and whether the VA prorated plaintiff's salary in violation of the Act and the VA Handbook, see Pl.'s Resp. 16; Pl.'s Reply 48.

C.      Count II:  Breach of the Implied Duty of Good Faith and Fair Dealing

Plaintiff contends that the VA breached the duty of good faith and fair dealing "by refusing to comply with . . . provision 3.E of the Settlement Agreement to pay [him] 100% salary of a full time physician in [the] Radiation Oncology Department," Compl. ¶ 31; see Pl.'s Mem. 40-41 (stating that the VA's "failure to deal fairly or in good faith is . . . evidence[d]" by the VA's "breach[] [of] the Settlement Agreement" and failure to pay plaintiff "an effective salary for a physician in the Radiation Oncology Department" (internal quotation marks omitted)), and by prorating his salary, see Pl.'s Mem. 40- 42. Plaintiff contends that, for each of these actions, "the presumption that the MVAMC acted in good faith is overc[o]me since 'it affirmatively appeared that the reason [for the action] was something improper, or the action was taken without reason.'" Pl.'s Resp. 1 (quoting Marcus v. United States, 200 Ct. Cl. 544, 552, 473 F.2d 896, 900 (1973) (en banc).

Defendant contends that "a good faith and fair dealing claim must be based upon a right or entitlement found in a pre-existing contract." Def.'s Resp. 26. And, according to defendant, "[b]ecause Dr. Kogan has not identified a specific contractual obligation from which the covenant of good faith and fair dealing could arise, his good faith and fair dealing claim should be dismissed." Id.

A plaintiff alleging breach of the implied duty of good faith and fair dealing in a government contract must show that the government acted in a way "specifically designed to reappropriate the benefits the other party expected to obtain from the [contract], thereby abrogating the government's obligations under the contract." Precision Pine, 596 F.3d at 829; see Centex, 395 F.3d at 1311 (similar). Moreover, what the implied duty of good faith and fair dealing "entails depends in part on what [a given] contract promises." Precision Pine, 596 F.3d at 830. Here, because the court finds that

22

the obligations required of the VA under Paragraph 3.E of the Settlement Agreement are ambiguous, see supra Part III.B.1, the court considers it premature to address whether the VA acted in a way "designed to reappropriate the benefits [plaintiff] expected to obtain from the [Settlement Agreement]," cf. Precision Pine, 596 F.3d at 829. Accordingly, summary judgment as to the breach of the implied duty of good faith and fair dealing portion of plaintiff's claim is precluded.

### D. There Are Genuine Issues of Material Fact as to Whether the VA Acted in Bad Faith

Plaintiff further argues that the VA's "actions toward [him] are 'so arbitrary and grossly erroneous as to constitute bad faith.'" Pl.'s Mem. 43 (quoting reporter's statement of Levering & Garrigues Co. v. United States, 71 Ct. Cl. 739, 757 (1931)). Plaintiff alleges that in early 2000, unbeknownst to plaintiff, see Compl. ¶ 9, the VA "falsified his record by changing his Radiation Oncology specialty to Internal Medicine/Sport Medicine specialty and consequently his Assignment from--Radiation Therapeutic (Radiation Oncology) to . . . Internal Med[icine],"[18] Pl.'s Mem. 9; see also id. at 42 (similar). That is, according to plaintiff, the VA "changed [his] status . . . from staff physician Radiation Oncologist (assignment code 39) to staff physician [Internal Medicine/]Sport Medicine (assignment code 21),"[19] Compl. ¶ 9; see Pl.'s Mem. 5-6, which also affected the VA payroll system, see Pl.'s Reply 52-53. Plaintiff states that the VA eventually "restored" plaintiff's status to that of a Radiation Oncologist on December 23, 2007. Pl.'s Mem. 15; see Pl.'s Reply 52 (claiming that "Dr. Kogan's 'assignment code' . . . was unlawfully changed one time and seven years later it was restored").

Plaintiff contends that the VA concealed this change from him when he signed the Settlement Agreement, and, in doing so, the "[]VA deprived Dr. Kogan of his right to fully evaluate his pre-settlement agreement working status and to introduce in the Settlement Agreement provisions . . . to restore his Assignment and . . . Radiation Oncology specialty in his record." Pl.'s Mem. 38-39; cf. id. at 40 (stating that the MVAHS failed to "restore Dr. Kogan's Radiation Oncology specialty in his record in 2002--at the time of the settlement negotiations"). Therefore, according to plaintiff, the Compensation Panel's recommendation for plaintiff's salary was based on a "deception" that plaintiff worked in two specialties--both Radiation Oncology and Internal

---

[18] Plaintiff claims that the VA disguised the change it made to plaintiff's record by changing the wording of the Settlement Proposal. Pl.'s Mem. 39; see id. at 29-30 (referring to "how [the] MVAHS Administration disguised the change in specialty they made in Dr. Kogan's record"); cf. supra note 17 (discussing the Settlement Proposal).

[19] According to plaintiff, "every medical specialty [in the VA] has [a] unique assignment Code": the assignment code for Radiation Oncology, a scarce specialty is 39, Pl.'s Mem. 5, and the assignment code for Internal Medicine/Sport Medicine, a non-scarce specialty, is 21, see id. at 6.

23

Medicine/Sports Medicine.  See id. at 22; cf. supra note 10 (discussing plaintiff's contention that the Compensation Panel based eighty percent of his salary on that of a physician practicing in Internal Medicine/Sports Medicine and that "[t]here is [no] such medical specialty as C&P nor [is there a] C&P salary").  Plaintiff contends that the VA intended "not to pay Dr. Kogan an effective salary for a physician in the Radiation Oncology Department," Pl.'s Reply 53 (internal quotation marks and emphasis omitted), by "[e]xploiting the fact[] that in Dr. Kogan's record and in the []VA payroll system his medical specialty [was] unlawfully changed to Internal Medicine/Sport Medicine," id. at 52-53.

The record supports plaintiff's contention that his assignment was changed to Internal Medicine/Sports Medicine in early 2000, see Def.'s Resp. App. A177 (Feb. 19, 2000 notification of personnel action) (listing internal medicine as plaintiff's assignment), and that he was reassigned to Radiation Oncology in 2007, see Pl.'s Ex. 15-16 (Def.'s Answers to Pl.'s Interrogs.) (stating that plaintiff's assignment code was changed back to 39 on December 23, 2007).  Defendant argues, however, that plaintiff "has provided no evidence to suggest that changes to his assignment code were the result of 'falsification,' implemented with the . . . intent to injure him, withheld from him, or that they had any effect at all on his pay or his position."  Def.'s Resp. 24.  According to defendant, "At all times relevant to the facts and circumstances at issue in this case, [Dr.] Kogan was fully informed that his payroll records periodically reflected 'internal medicine' as an assignment," and the "MVAHS did not withhold that information from him."  Id.  As support, defendant points out that, since at least February 19, 2000, plaintiff has received notifications of personnel action that specifically listed plaintiff's assignment as internal medicine, id., and, indeed, the record suggests that plaintiff received at least seven notifications of personnel action between February 19, 2000 and February 18, 2002, several of which identified "internal med" as plaintiff's "assignment," see Def.'s Resp. App. A177-183 (notifications of personnel action) (capitalization omitted); cf. Pl.'s Ex. 13-14 (Def.'s Answers to Pl.'s Interrogs.) (stating that employees receive original notifications of personnel action if their employee codes are changed and that copies are placed in their personnel folders).

Defendant further contends that plaintiff's argument that the Compensation Panel considered plaintiff a physician in Internal Medicine/Sports Medicine is similarly unsupported.  Def.'s Resp. 24.  Defendant claims that plaintiff "has provided no evidence to establish that the Compensation Panel was even aware" that plaintiff's payroll code "periodically changed between 2000 and 2006."  Id.; see Pl.'s Ex. 60 (Decl. of Ms. Johnson) (stating that the "[Compensation] Panel did not consider any codes that may have been used to describe Dr. Kogan in the MVAMC computer system").

Plaintiff counters that "[d]efendant does not present any evidence" that the VA acted lawfully when it changed his assignment to Internal Medicine/Sports Medicine.  Pl.'s Reply 44.  However, to the extent that plaintiff alleges that the VA acted in bad

faith, the burden is on plaintiff to overcome the presumption that government officials discharge their duties in good faith. Cf. Road & Highway, 702 F.3d at 1368 (stating that "it is well-established . . . that a high burden must be carried to overcome this presumption, amounting to clear and convincing evidence to the contrary" (omission in original) (internal quotation marks omitted)). The high burden of proof has "been equated with evidence of some specific intent to injure the plaintiff." Galen, 369 F.3d at 1330; see Road & Highway, 702 F.3d at 1369 ("[A] challenger seeking to prove that a government official acted in bad faith in the discharge of his or her duties must show a specific intent to injure the plaintiff by clear and convincing evidence" (internal quotation marks omitted)).

Notwithstanding the high burden that plaintiff must overcome to establish bad faith on the part of government officials, the court finds that there are genuine issues of material fact as to whether the VA acted in bad faith when it changed plaintiff's assignment to Internal Medicine/Sports Medicine. The court also finds that there are genuine issues of material fact as to the effect of this change on plaintiff's personnel records and payroll. Accordingly, summary judgment as to these portions of plaintiff's claim is precluded.

IV.    Conclusion

Given the foregoing, plaintiff's Motion is DENIED, and defendant's Motion is DENIED-IN-PART. To the extent that defendant seeks dismissal of plaintiff's claims for punitive damages and relating to his future pension, defendant's Motion is GRANTED-IN-PART. See supra Part III.A (finding that the court lacks jurisdiction over these aspects of plaintiff's suit). The court will contact the parties to arrange a telephonic status conference to address further proceedings in this matter.

IT IS SO ORDERED.

_____
EMILY C. HEWITT
Chief Judge

25